In the Matter of CARLA LEATHER, INC., Debtor.

Bankruptcy No. 84 B 10700.

United States Bankruptcy Court, S.D. New York.

Nov. 2, 1984.

Ryan & Silberberg, Washington Drucker, New York City, for movant by Philip E. Silberberg, New York City, of counsel.

Chester B. Salomon, P.C., David Green, New York City, for interim trustee.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for Andrew J. Tunick, Louis A. Scarcella, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for Eliot H. Lumbard, Trustee of the Estate of Meritum Corp. by Richard F. Ziegler, and Scott Horton, New York City, of counsel.

Barst, Mukamal & Babitt, New York City, for the debtor-in-possession by Enid Stuart, New York City, of counsel.

The Office of the United States Trustee for the Southern District of New York by Cornelius Blackshear, U.S. Trustee, S.D. N.Y., New York City.

## DECISION ON TRUSTEE'S MOTION TO APPROVE SETTLEMENT, ETC.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

David Green, interim trustee for the Estate of Carla Leather, Inc. ("Carla" or "Debtor") and Eliot Lumbard, trustee for the Estate of Meritum Corp. ("Meritum"), jointly apply for an order from this Court approving the settlement and dismissal of certain claims between the Debtor and Meritum and the joint retention of Meritum's counsel pursuant to Rule 9019 of Bankruptcy Rules of Procedure ("Rules"). Lumbard asks this Court to certify Green as Trustee for Carla. Washington Drucker, a principal of the Debtor ("Drucker"), requests this Court to declare Green ineligible as a matter of law to serve as trustee and to appoint a new and disinterested Trustee pursuant to Rule X–1006(c).

### I.

#### A. *The Carla-Meritum Relationship*

Carla filed a petition under Chapter 7 of the U.S. Bankruptcy Code ("Code") 11 U.S.C. § 301 on May 8, 1984. Prior to the filing, the company had manufactured, distributed and sold women's leather apparel. According to a complaint filed by Lumbard in the United States District Court for the Southern District of New York on January 3, 1984 (the "Complaint"), Carla began business in 1975 and operated for close to seven years. Despite increased sales throughout its operating history reaching $4.8 million for 1979, Carla sustained an operating loss of $399,506 for 1979, and an alleged loss in excess of $1.5 million for 1980. It was allegedly insolvent by December 31, 1981, with a negative net equity of close to $4 million. By the summer of 1982, Carla had employed a law firm apparently in contemplation of filing a petition in bankruptcy.

Since 1976, Meritum acted as Carla's factor and held a continuing security interest in at least all of Carla's present and after-acquired inventory, products and proceeds thereof.[1] The factoring arrangement between the two has been restructured throughout the history of Carla's business with new security agreements executed in 1977 and 1978. Simultaneously with the execution of the initial Security Agreement, Carla's two owner-principals, Washington Drucker and Aron Vaisman, and their wives, personally guaranteed all of Carla's obligations to Meritum. That guaranty was reaffirmed in April 1977. Drucker and Vaisman reaffirmed their guarantees in November 1978.

Of the various early reformations, the most material here is that contained in a letter agreement of November 1978 (the "November 1978 Agreement"). Pursuant thereto, Meritum would loan Carla up to eighty percent of the net amount of accounts arising from Carla's ordinary course of business. In exchange, Carla agreed to pay Meritum compound interest on its loan at a rate of 9% per annum above the prime interest rate as quoted by the Chase Manhattan Bank, N.A., at the last business

---

1. The initial factoring agreement was not exhibited before this court.

dayof each preceeding month. Such interest was charged monthly on unpaid principal and unpaid interest. The November 1978 Agreement enabled Meritum to debit Carla's account monthly for the preceeding month's interest. It further provided for Meritum to render a monthly statement of account and that "[s]uch Statement of Account shall constitute on Account Stated unless [Carla] shall make written objection thereto within thirty days from the date thereof."

In 1981, Carla sought factoring from Milburg Factors. Apparently, Milburg would not agree to factor Carla until Meritum waived past interest owed it from Carla. As a result, Meritum in a letter agreement of June 5 of that year agreed to waive one million dollars of unpaid interest in exchange for Drucker and Vaisman's agreement to, as primary obligors, jointly and severally assume primary obligors the one million dollars interest due Carla by Meritum. Interest on that said million was to be paid "at the highest rate permissible by law from the date hereof until the entire balance and paid in full."

The two companies again restructured the terms upon which Meritum would make revolving loans to Carla by letter agreement of April 6, 1982 (the "April 1982 Agreement"). In that agreement, Carla reaffirmed its debt to Meritum at $6,675,-000 as of December 31, 1981. Meritum forgave interest charged Carla between July 1, 1980 and December 31, 1981 in the amount of $1,663,902, and Meritum consented to reduce, from 9% above prime to 1½% above prime, the interest charged on the post-restructuring balance of January 1, 1982, and any future borrowing. Meritum also consented to exchange $2,500,000 of the remaining $5,011,098 debt for 2,500 shares of $1,000 par value preferred stock which Carla would newly issue.

Subsequent to this restructuring of Carla's debt to Meritum, Meritum, according to Lumbard, solicited financing from numerous factors and commercial finance institutions on Carla's behalf. Lumbard alleges that in early May, 1982, Brancorp Factors, Inc. ("Brancorp") offered to factor Carla's accounts if Carla would file a Chapter 11 petition and the bankruptcy court would agree to subordinate to Brancorp, Meritum's rights in Carla's assets and income. Meritum would not agree to subordinate its claim, and by mid-May, 1982, Carla ceased operating in the ordinary course and began liquidating its inventory and other assets.

### B. *The Lumbard Complaint*

Meritum filed a voluntary reorganization petition under Chapter 11 of the Code on May 28, 1982. This Court converted that Chapter 11 proceeding to Chapter 7 on September 27, 1982. Eliot Lumbard was appointed trustee and in that capacity he commenced an action in the district court on February 3, 1984. His Complaint charged Carla Maglia ("Maglia"), Brancorp, Washington Drucker, his brother Bernardo Drucker, Aron Vaisman, the accountant to Carla and to Maglia, and others, including Carla, in various combinations, with willfully and knowingly conspiring to fraudulently convey to Maglia all of Carla's assets and income necessary to its continuation in business and to defraud Meritum while frustrating any judgment to which the Meritum estate might become entitled. In addition to common law claims and claims against Drucker and Vaisman on their individual guarantees, Lumbard charged the defendants to the action with violating the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962, upon which federal jurisdiction is predicated.

In support of his Complaint, Lumbard avers that a new company named Maglia was incorporated in May 1982 and that Carla transferred to it assets said to have a value exceeding $5 million. He asserts that Carla's cessation of business, the incorporation of Carla Maglia, and alleged transfers of Carla's assets were component parts of a scheme by which Drucker, Vaisman and Brancorp could continue in Carla's

business while avoiding its obligations to Meritum.[2]

It is also asserted that Carla owed Meritum $9,419,105.41 when it ceased business in the spring of 1982. By October 31, 1983, $2,882,850.25 of interest, apparently computed according to the November 1978 Agreement, had accumulated. In the district court, Lumbard seeks damages equal to the total of principal plus interest due on that date of $12,292,955.66 plus any interest which has accrued since that time. Pursuant to RICO, he requests treble damages of $36 million.

### C. The Carla Bankruptcy Proceedings

Within a few months after Lumbard commenced his action in the district court, Carla filed its voluntary petition with schedules indicating assets worth $2,500. A claim against Drucker and Brancorp, et al. for diversion of its business was not scheduled. The schedules indicated that Carla had general unsecured debt of $897,329.95. Meritum's claim of $12,292,955.66 was not listed. The United States Trustee for the Southern District of New York immediately appointed David M. Green to serve as interim trustee. A few days after Green's appointment, Brancorp's attorney telephoned him and called his attention to Lumbard's district court action. He informed Green that the Complaint asserted several causes of action belonging to Carla and that Carla had four possible defenses to Lumbard's claim against it: the claim is based on compounded interest in violation of New York public policy as recently reaffirmed in *Giventer v. Arnow*, 37 N.Y.2d 305, 333 N.E.2d 366, 372 N.Y.S.2d 63 (1975); interest on the loan was usurious, apparently since the base rate had risen to

the point where the overall interest rate exceeded the 25% per annum rate permitted by N.Y. Penal Law § 190.40 (McKinney's 1975); Meritum's claim was subject to equitable subordination; and that Lumbard's claim was overstated in that it did not reflect the debt reduction agreed to in the April 1982 agreement.

During the following few weeks, Green had further conversations with Brancorp's attorney. Their conversations consumed approximately 5 hours. He then met with Lumbard's attorneys to further explore the factual basis of Meritum's claim and its responses to the possible defenses noted above. Their conversations, taken together with negotiation of the settlement proposed, consumed 24 hours.

As part of his investigation, Green, a member of the bar since 1980, spent seven hours independently researching the legal basis for the defenses identified by Brancorp's attorney. Because he read *Giventer* not to preclude compound interest where the consideration for it lay in the creditor's forebearance and because he thought the "account stated" clause of the November 1978 Agreement was written in exchange for Meritum's forebearance in asserting its security interest against Carla, he concluded that the defense based on illegally compounded interest was untenable. He also concluded that reaffirmed debts, variable interest rate loans not charging over 25% at their inception and transactions over $2.5 million could not be usurious. For these reasons and because he thought that a defense of usury, as a defense of *in pari delicto*, could not be asserted against a trustee, Green decided that an usury de-

---

**2.** In addition to the transfer of Carla's assets to Maglia in the circumstances noted, Lumbard alleges that: Maglia maintains its principal place of business in premises formerly leased by Carla or its affiliate; Maglia continues the business of manufacturing, distributing and selling woman's leather apparel; Bernardo Drucker, brother and business partner of Washington Drucker, is Maglia's nominal shareholder of record; Washington Drucker has been employed by or associated with, Maglia as a principal since its inception; Aron Vaisman has been employed by or associated with Maglia for a

period from its inception until approximately May of 1983; Kadish, Rubinroit & Co., a certified public accounting firm, provided accounting and financial advisory services to Carla Leather and has provided the same services to Carla Maglia since its inception; Hyman Rubinroit, a member of that firm, represented both Carla and Maglia in the negotiations with third parties; Brancorp entered into a factoring agreement with Maglia and at all times since June 1982 has been Maglia's sole financing source, and Maglia continues to operate, purportedly free of any debt to Meritum.

fense would not be effective against Lumbard. He felt further justified in that determination since neither Drucker nor Carla had pleaded usury as an affirmative defense in answering Lumbard's Complaint.

Green reached the same conclusion with respect to the purported equitable subordination and debt reduction assertions. As to the former, no abuse by Meritum was called to his attention; as to the latter, he found the April 1982 Agreement to be of no effect since Carla had breached it by failing to issue Meritum the $2.5 million preferred shares.

Green also engaged an accountant to assist him in making his analysis and evaluating Carla's and Meritum's books and records as they related to the factoring relationship between the two companies. In the forty-five hours spent culling through those records, the accountant and his associate paid particular attention to the usury issue and to confirmation of the amount claimed by Lumbard. They calculated annual and monthly interest rates and monthly loan balances for 1979–1982, finding that though monthly interest charges never exceeded 25%, by November 1979, the annual rate of interest charged had climbed to 25.08% and hovered between 25% and 26.98% until August 1982. (Trustee's Exh. 3) While the accountant was able to tie in the amount of Lumbard's claim to the April 1982 Agreement and to roll it forward through the addition of interest charges, the process by which the total amount of Lumbard's claim was calculated is unclear. At the hearing, the accountant admitted that he had mistakenly included personal accounts of Vaisman and Drucker which total approximately $1.25 million.

### D. *The Proposed Settlement*

Finding no fault with Lumbard's assertion that Meritum had perfected its security interest in all of Carla's assets, Green determined that there was little, if any, likelihood of a dividend to any of Carla's creditors other than Lumbard absent an agreement whereby Carla's other creditors could participate in the recovery achieved in Lumbard's district court action.

As it stood, there was considerable confusion as to which of the Complaint's fourteen causes of action could be pursued by Carla and which by Meritum. Lumbard's action in the district court was itself in limbo. Brancorp had moved that it be stayed under § 362 of the Code effective upon Carla's filing of bankruptcy, and Judge Gerhard Goettel had scheduled a pre-trial conference for June 22, 1984, apparently in order to explore that issue. Believing that the interests of Carla's creditors lay in maximizing possible recovery in the district court, Green chose to quickly resolve any conflict between the Carla and Meritum estates so that action could proceed. Since Lumbard's counsel, Cleary, Gottlieb, Stein & Hamilton ("Cleary"), had already undertaken an extensive investigation, Green sought to engage Cleary to pursue Carla's district court claims in order to avoid unnecessary expense through duplication of legal work.

In negotiating the settlement, Green first proposed a 25% to Carla/75% to Lumbard sharing of recovery from Lumbard's district court action, coupled with an initial $250,000 distribution to Carla free of Lumbard's claims. The parties considered other proposals, spoke of sharing attorney's fees and settled on the proposed agreement after three or four days of negotiations. The settlement was founded on joint pursuit of both estates' claims in the district court action and on the reduction of Lumbard's claim from $12,292,955.66 as of October 31, 1983, to $10,891,820. The difference, according to assertions at the hearing, was calculated by giving effect to the million dollar reduction agreed to in June 1981 and subtracting the interest charged on that sum from that date. Carla would receive the first $250,000 clear of any claims by Lumbard. Proceeds of the recovery would be distributed with ⅚ going directly to the Meritum estate and ⅙ going directly to the Carla estate. Of the ⅙th received by the Carla estate, the Meritum

trustee would not be entitled to share in the first $250,000 so received. As to the remainder, Lumbard would participate as an unsecured creditor. Judge Edward Ryan of this Court, to whom the Meritum bankruptcy case is assigned, authorized Lumbard to enter into the settlement on September 6, 1984.

### E. *The Creditors' Meeting*

A meeting of Carla's creditors pursuant to § 341 of the Code was held on July 25, 1984. The Assistant United States Trustee presided. Four creditors requested an election of a trustee pursuant to § 702 of the Code, and no party objected. Those four creditors voted their claims, totalling approximately $546,719, for Andrew J. Tunick. Lumbard presented a proof of claim in the amount of $10,891,821 and voted that claim for Green. Carla's counsel objected to Lumbard's claim being voted, contending that it is disallowed under § 702 of the Code since Lumbard holds "an interest materially adverse" to the debtor and asserts a claim which is "disputed." Consequently, the United States Trustee was unable to certify the results of the election.

Rule X–1006(c) establishes a deadline of ten days after the § 341 meeting for making a motion to resolve an election dispute. The United States Trustee's report recommended a deadline of ten days post-issuance of his report. The report was issued on August 2, 1984 and received by Drucker's attorney on August 9, 1984.

Both deadlines passed without any party in interest having filed a motion for resolution. Washington Drucker served such a motion on August 13, 1984, but did not file it until August 16, 1984.[3]

## II.

From these most recent events arise Drucker's challenges to both Green's status and his ability to enter into and propose the settlement. He contends that any examination of the proposed settlement between Meritum's trustee and Carla's inter-

im trustee is academic since Tunick, not Green, was elected permanent trustee of Carla at the creditors' meeting of July 25, 1984. To this it is added that Lumbard should be disqualified from voting for Carla's trustee, and that Lumbard's casting his vote for Green contemporaneously with the settlement negotiations between the two was improper.

■ In case of an election dispute, Rule X–1006(c) requires the presiding officer of the creditors' meeting promptly to inform the court of the dispute and continue the interim trustee in office pending its resolution. The rule further provides: .

> If no motion for the resolution of the election dispute is made to the court within ten days after the date of the creditors' meeting, the interim trustee shall serve as trustee in the case.

The challenge to Green's current standing to propose the settlement is thus without merit. Until the election dispute is resolved, he continues in office.

Furthermore, if no motion for resolution to the court of the dispute is made within ten days of the meeting, Rule X–1006(c) provides that Green shall serve as trustee. The creditors' meeting here was held on July 25, 1984. Thus, the deadline for motions to resolve the dispute, falling on a Saturday, was extended to Monday, August 6, 1984 and passed with no timely motion having been filed. The Assistant United States Trustee, however, not only recited the terms of Rule X–1006(c) but added his recommendation "that the ten day period commence from the date of the report so that parties will be provided ample time to take whatever position they deem appropriate." Drucker and Tunick claim that Drucker relied on this statement in contending that the motion for resolution of the dispute, served on August 13, 1984, was timely.

In so arguing, they interpret Rule X–1006(c) as requiring service before the deadline. Since the report of the United States Trustee was dated August 2, 1984

---

3. Drucker was joined in his motion by Bobellen Corporation, a creditor of Carla.

and since the tenth day fell on a Sunday, they contend that the deadline did not pass until August 13, 1984. Drucker also presses for leniency in enforcing the deadline since he claims that he did not receive the report until August 9, 1984.

In stating that the motion should be "made to the court," the rule is arguably ambiguous in whether it contemplates service or filing before that date. The phrase "to the court" could mean filing or could merely indicate that an election dispute is not to be resolved by the presiding officer at the meeting. The Advisory Committee Note to Rule X–1006(c) is of little guidance. It states that the "court should be informed immediately about the election or non-election of a trustee." Presumably, the report itself should furnish the court with such information. Here, we do not have to reach the issue of whether service or filing controls. In this case, the deadline of August 6, 1984 cannot be enlarged.

Rule 9006(b)(2) precludes enlargement of the 10 day time period for such motions prescribed by Rule 2003(d). That rule applies in non-pilot districts and is identical to Rule X–1006(c) in its requirement that an election dispute motion be made in ten days. No reason has been advanced why a pilot district should be different. Indeed, these rules sharply reflect the notion that all election disputes are to be discouraged. Such disputes delay administration and contribute little to speeding the return to creditors. By requiring the motion to be made quickly and providing that the interim trustee shall continue to serve in the event that the motion is not made within the ten day period, these rules seek to limit such disputes and allow the bankruptcy proceeding to continue with the trustee, whoever he or she may be, moving forward in marshalling the assets of the estate.

Given that Rule 9006(b)(2) does not expressly refer to Rule X–1006(c), enlargement might be possible in the face of compelling equities. Yet the absence of an allegation by Tunick or Drucker of undue hardship which the policies noted above would minimally require, makes such action unwarranted in this case. As an insider, Drucker's interest is insufficient under Code § 702(a)(3) to grant him sufferage at the Trustee's election. Tunick also enjoys no such right. Both the ten-day requirement and the Assistant United States Trustee's recommendations were stated at the meeting. No assurance was given that his recommendation would be followed. Drucker, the only person to file the required motion, did not attend the creditors' meeting. He therefore could not have relied on the Assistant United States Trustee's comments.[4] His motion cannot be recognized; accordingly its substance need not be discussed.

### III.

The Supreme Court has spoken clearly of the court's role in passing upon proposed settlements under the former Bankruptcy Act. 11 U.S.C. § 1 *et seq.* (1938) (repealed). *Protective Committee v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). The Bankruptcy Court is to make an "informed and independent judgment" as to whether a proposed compromise is "fair and equitable," based on an

> educated estimate of the complexity, expense and likely duration of ... litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

*Id.* at 424.

This standard of inquiry does not portend substitution of the court's judgment for that of the trustee. Nor is the court "to decide the numerous questions of law and fact raised by [objectors] but rather to canvass the issues and see whether the settlement 'falls[s] below the lowest point in the range of reasonableness.'" *In re W.T. Grant & Co.,* 699 F.2d 599, 608 (2d

---

4. While Bobellen Corporation is a creditor apparently entitled to sufferage, there is no evidence that it relied on the Assistant United States Trustee's statements.

Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 89, 78 L.Ed.2d 97 (citation omitted).

The factors applicable to that consideration under the former Bankruptcy Act are well established:

> (a) the probability of success in the litigation;

> (b) the difficulties, if any, to be encountered in the matter of collection;

> (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;

> (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

*Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929); *Matter of Marshall,* 33 B.R. 42, 9 C.B.C.2d 691 (D.Conn.1983).

With the bankruptcy court's surrender, upon the enactment of the Code, of its administrative role under the Bankruptcy Act, even more reason exists for focusing determination on whether the settlement falls within the bounds of reasonableness. As resolver of disputes to which a fiduciary is a party, the inquiry should parallel that contemplated by Rules 23 and 23.1 of the Federal Rules of Civil Procedure, pursuant to which courts are called upon to consider settlement of a class or derivative action. In those cases, a reasonableness standard applies, the courts comparing the substantive terms of the proposed settlement with the likely result of a trial. *Weiss v. Drew Nat. Corp.,* 465 F.Supp. 548 (S.D.N.Y. 1979); *Burger v. CPC Intern, Inc.,* 76 F.R.D. 183 (1977); *Malchman v. Davis,* 706 F.2d 426 (2d Cir.1983). The similarity of this test to that applicable under the Bankruptcy Act strongly indicates that the change in the bankruptcy court's role is no warrant for changing the test. It thus applies to cases under the Code. *See Matter of Marshall,* 33 B.R. 42 (D.Conn.1983.) [5] With Green's status to enter into the proposed settlement as either permanent or interim trustee, thus resolved, we now turn to consideration of the settlement itself pursuant to Rule 9019(a).

### IV.

#### A. *Probability of Success*

■ In attacking the settlement as improvident, Drucker directs his fire principally to the Trustee's proposed allowance of Lumbard's claim. He urges that the claim should not be allowed because it is based on compound interest, reflects an usurious interest rate and is subject to equitable subordination. The last of these three points does not merit discussion since there is no indication of misconduct warranting subordination. *Matter of Mobile Steel Co.* 563 F.2d 692, 699–700 (5th Cir. 1977). The other two raise considerations going to the heart of the settlement in view of the uncontradicted evidence that interest was indeed compounded and that at various times an annual interest rate in excess of 25% was charged.

#### i. *Interest on Interest*

■ The most troublesome of the objections raised by Drucker is his assertion that much of the claim is based on interest on interest, for under New York law an agreement to pay interest on interest is generally unenforceable as against public policy. *Newburger-Morris Co. v. Talcott,* 219 N.Y. 505, 114 N.E. 846 (1916) (Cardozo, J.); 40 N.Y.U.L.R. 1159, 1160–61 (1963); 32 N.Y.Jur., *Interest and Usury,* § 9 (1963). The penalty for charging interest on interest is, however, a "limited sanction," more lenient than that imposed for usury: only the compounding clause is invalidated and the lender may recover his principal plus simple interest. *Giventer v. Arnow,* 37 N.Y.2d at 309, 333 N.E.2d 366, 372 N.Y. S.2d 63 (1975); 32 N.Y.Jur., *Interest and Usury* § 56 (1963).

■ The principal exception to the general proscription outlined above is that an

---

**5.** Settlements are considered by the bankruptcy courts under the procedures established by Rule 9019(a), substantially the same as Rule 919(a), its predecessor applicable under the Bankruptcy Act. That substantial identity further supports the conclusion that the standard employed under the Act should be maintained.

agreement to pay interest on past due simple interest is enforceable. *American Express Co. v. Brown*, 392 F.Supp. 235, 238 (S.D.N.Y.1975); *Giventer*, 37 N.Y.2d at 308, 333 N.E.2d 366, 372 N.Y.S.2d 63. Green decided that the Meritum claim was indisputable on this basis. Such a conclusion presumes that simple interest was past due when Carla and Meritum entered into the November 1978 Agreement. Drucker does not contend otherwise. The agreement is therefore enforceable, at least to the extent that it provides for interest on interest already accrued. *Newburger-Morris v. Talcott*, 219 N.Y. at 510, 114 N.E. 846; *Household Fin. Corp. v. Goldring*, 263 App.Div. 524, 528, 33 N.Y.S.2d 514 (1st Dept.), *aff'd*, 289 N.Y. 574, 43 N.E.2d 715 (1942).

■ Furthermore, since Carla, in April 1982, agreed that it owed Meritum $6.675 million, apparently pursuant to the November 1978 Agreement's compounding clause, it must be deemed that Carla ratified the previous charges of compound interest. Because an agreement to pay interest on interest is not void but merely voidable, this concession by the borrower acted as a ratification of that agreement. Cf. 32 N.Y. Jur., *Interest and Usury* §§ 87, 95 (1963). Green's conclusion that an interest on interest defense against Meritum's claim would fail is thus reasonable as to the $6.675 million ratified.

■ Whether the April 1982 Agreement is enforceable as to compound interest that subsequently accrued is less clear. It does not provide for ratification of compounded interest to be charged in the future. The exception concerning interest on past due interest is premised on the lender's forebearance in collecting the interest due or some other adequate consideration, *Newburger-Morris*, 219 N.Y. at 510–511, 114 N.E. 846. It does not logically follow that the exception applies to interest not yet accrued. To the extent *American Express Co. v. Brown*, 392 F.Supp. at 238, indicates anything to the contrary, the court's statement that such compounding is permissible constitutes *dicta;* the promissory note

there in issue seemingly contemplated only the payment of simple interest. That *dicta*, moreover, cannot be squared with the *Newburger-Morris* line of cases which is controlling here.

In arguing that Meritum could permissibly charge interest on interest accrued after April 1982, Green and Lumbard rely, not on *American Express*, but on the "account stated" clause of the November 1978 Agreement. They claim that the rule does not apply to an account receivable financing agreement where an account stated is rendered each month and accepted by the obligor without objection.

That issue is not easily resolvable under New York authority either called to our attention or which we have been able to find. Its analysis necessarily begins with *Newburger-Morris*, an action brought by a borrower for an accounting against its factor who had agreed to loan against set percentages of the net cost of inventory and of the net value of accounts receivable. During the term, the factor rendered monthly statements reflecting a compounding of interest due from preceding months. After observing that "a promise to pay compound interest will be enforced, if made after simple interest has accrued and the promise may be the implied one that results from the statement of an account," 219 N.Y. at 510–511, 114 N.E. 846, the court held that a statement of account unaccompanied by a demand for payment was insufficient to warrant the exception. 219 N.Y. at 512, 114 N.E. 846. Judge Cardozo determined that without a demand for payment "forebearance or other consideration to make the [implied] promise good" was lacking, 219 N.Y. at 511, 114 N.E. 846. Merely debiting the obligor's account was not enough.

A contrary decision was reached in *In re Magnus Harmonica Corp.* 262 F.2d 515, 518 (3rd Cir.1959). There, the factoring agreement at issue provided that a monthly statement which included accrued interest in the principal amount stated would be permissible unless contested within 30 days. See *Commercial Contracts without*

*Contractual Recourse: The Interest on Interest Rule New York*, 40 N.Y.U.L.R. 1159 at 1164 (1965). Though the decision interpreted New York law, it is not persuasive because it fails to consider the forebearance requirement set forth in *Newburger-Morris.*

Application of these concepts to accounts receivable financing pursuant to Article 9 of the Uniform Commercial Code has been criticized. *The Interest on Interest Rule in New York, supra,* at 1165–1169. Revolving credit arrangements, similar to that arranged under the November 1978 Agreement, are not uncommon. Whether the New York courts will continue to follow *Newburger-Morris'* requirement of an account stated in analyzing such arrangements remains to be seen. It need not be resolved on this motion. That the issue can be raised in light of the authority noted, does, however, form a basis upon which parties can compromise.

We thus conclude that Meritum's having charged compound interest would not, contrary to Drucker's claim, cause a forfeiture of either principal or interest. At a minimum, Meritum would be entitled to simple interest, and it is highly likely that upon litigation of its claim Meritum would be entitled to the $6.675 million debt ratified by Carla. Whether Lumbard could recover compound interest subsequent to December 1981, as opposed to merely simple interest, is arguable.

ii. *Usury*

■ Corporations do not enjoy the benefits of the statutory limits on interest imposed by New York's usury statute, N.Y. General Obligations Law § 5–21(d), (McKinney's 1982). Nevertheless, loans to corporations are not exempt from the criminal usury provisions of § 190.40 of the New York Penal Law. N.Y. General Obligations Law § 5–521(3). (McKinney's 1975). Section 190.40 provides:

A person is guilty of criminal usury when, not being authorized, or permitted by law to do so, he knowingly charges, takes, or receives any money or other property as interest on the loan ... at a rate exceeding twenty-five percentum per annum or the equivalent rate for a longer or shorter period.

■ In analyzing Lumbard's claim, Green relied on his accountant in concluding that the interest rate never exceeded 25% of the existing principal and accrued interest. The accountant's work papers indicate monthly interest rates of up to 24.99%, but they also show, since interest was folded into the principal on a monthly basis, that Meritum charged an effective annual rate of interest in excess 25% in all years from 1979 through 1982. Green's reliance on monthly rates was thus untoward. The statute clearly speaks of an annual rate. The "true interest rate", an expression employed by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 531 N.E.2d 278, 446 N.Y.S.2d 917 (1981), is the total interest called for in a given transaction compared to the total principal actually received. To determine the annual rate, the total interest paid is to be divided by the total years. *See Band Realty Co. v. North Brewster, Inc.*, 37 N.Y.2d 460, 335 N.E.2d 316, 373 N.Y.S.2d 97 (1975); Debtors and Creditors, Vol. 4 ¶ 16.04(A) (Matthew Bender & Co. 1984). Although the loan was not usurious when made, it, presumably through an increase in the prime rate, reached the 25% limit. On this record, it appears that annual interest charges exceeded that limit. Charging interest monthly at the legal limit, when compounded, resulted in an annual rate in excess of 25%.

Green discounts the import of this analysis by pointing to those jurisdictions that exempt variable interest rate loans from usury penalties where the interest rate does not exceed the legal limit at the time of contract. The New York courts, however, have not spoken on that question and the courts that have dealt with it are split. Annot., 18 A.L.R. 4th 1068 (1982). Since § 190.40 of the N.Y. Penal Code is a "charging" statute, violated by one who "knowingly charges, takes, or receives" in-

terest above the 25% limit, it seems that merely charging an usurious rate violates the statute. It is thus at least presumable that New York courts would not exempt from scrutiny for usury violations variable interest rate loan agreements which, although legal on their face, ultimately require interest in excess of 25% per annum.

 This conclusion is supported by § 5–501(6)(b) of the New York General Obligations Law. (McKinney's 1983). That statute exempts from the usury prohibitions of both § 5–501 of the New York General Obligations Law and § 190.40 of the New York Penal Law those transactions in which the principal advanced exceeded $2,500,000.

Enacted in 1980, a time when the prime rate banks were charging to their most favored customers had pushed variable rates to the legal limit and beyond, the exemption was apparently motivated by exactly that situation, *see* Executive Dept. Memorandum on Chapter 369 of 1980, McKinney's Session Laws of 1980, pg. 1766. It thereby strongly infers that variable interest rates are not *per se* exempt from the prohibition of § 190.40 of the N.Y. Penal Law. (McKinney's 1976).

On sounder footing is Green's contention that § 5–501(6)(b) makes untenable an usury defense to Meritum's claim. He argues that the amendment should be applied to loan transactions entered into before the effective date of that statute (1980) and which call for interest to be paid after that date. Such an assertion brings legislative intent into question—a matter which neither side has elected to brief before this Court. In view of the unparalleled and unforeseen rise in interest rates prompting enactment of the exemption, it would seem that the legislature, in addition to insuring the continued availability of new credit, sought to afford relief to companies from the preciptious increases just experienced.

Drucker does dispute, however, that Carla owed principal in an amount exceeding $2.5 million. He argues that the sums claimed by Lumbard reflected compounded interest barred by New York public policy.

That assertion is of no merit here. The April 1982 Agreement, in stating that the Carla debt due to Meritum at December 31, 1981 amounted to $6,675,000, satisfied the new agreement requirement articulated by Judge Cardozo in *Newburger-Morris.* That account stated clause effectively causes past due interest as of December 31, 1981 to be treated as principal under the terms of the November 1978 Agreement. Since the $6,675,000 agreed to as owed far exceeds the statutory floor of $2.5 million, the exemption provided for in § 5–501(6)(b) of the New York General Obligations Law would apply.

 Moreover, the usury issue in this case is not terribly significant. New York law has traditionally differentiated transactions that subsequently become usurious from those initially calling for interest to be paid at an usurious rate. Payments in excess of the legal rate of interest pursuant to demands under an agreement not usurious in its inception "cannot vitiate the original transaction... (citations omitted) Such excess payments must be applied in reduction of the principal and against the lawful interest." *In re Spiro's Will,* 280 App.Div. 982, 116 N.Y.S.2d 391 (2d Dept. 1952). *See also Matter of the Accounting of Consalus,* 95 N.Y. 340 (1884). Here, those amounts have not been calculated but are under 2% of the principal due each year.

### iii. *In Pari Delicto*

In deciding that the usury defense to Meritum's loan was insupportable, Green further considered and relied on *Podell & Podell v. Feldman,* 592 F.2d 103 (2nd Cir. 1979), to conclude that Lumbard as trustee is not subject to many of the defenses that could equitably be raised against claims asserted by Meritum. *Podell* held that an *in pari delicto* defense based on the illegality of a transaction cannot be employed to defeat a suit by a trustee in bankruptcy to recover corporate assets unlawfully transferred in violation of the conflict of interest statute, 18 U.S.C. § 371. That

holding is grounded on the rationale that innocent creditors represented by a trustee in bankruptcy should not suffer as a result of a defense based on a debtor's deleterious actions. That reasoning is inapplicable here. In this case, innocent creditors are present on both sides.

Furthermore, § 541(e) of the Code vests Green as trustee with "the benefits of any defense available as against an entity other than the estate, including ... usury." Green's assertion of the lack of such a defense by virtue of the holding in *Podell*, a case under the former Bankruptcy Act, is thus wanting.

#### iv. *Reasonableness of the Estimate of Probability of Success*

These considerations give rise to the following analysis of Lumbard's claim: to the extent it is based on compounded interest, only simple interest on the $6.675 million agreed to can be awarded; at a 25% rate, the maximum allowed, such interest would amount to roughly $1.705 million a year for the two and a quarter years from December 31, 1981 to April 25, 1984 when Carla filed its petition in bankruptcy; that interest totals approximately $3,836,000 making a total claim of close to $10,511,000.[6]

The doubt as to whether *Newburger-Morris* will be strictly applied to an accounts receivable financing agreement does support a compromise at some higher figure. Similarly, if any discount should be taken for Meritum having charged a rate of interest greater than 25% *per annum*, it would be fairly small. The maximum discount would be the amount charged over 25%, an unidentified sum not exceeding 1.98% for any year. The substantial argument that the transaction is totally exempt from usury constraints pursuant to §

5–501(6)(b) of the General Obligations Law deems reasonable Green's disregard of the usury defense.

Although we have taken care to quantify these considerations, the assessment of a settlement does not require resolution of these issues; it requires only their identification so that the bounds of reasonableness can be seen with some clarity:

> The very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise .... This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty.

*Florida Trailer and Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir.1960).

Most significantly, the reasonableness of a trustee's judgment with respect to a settlement is not to be measured by taking these numbers in a vacuum. The bottom line of whether this settlement is in the best interest of the creditors is found by comparing the dollar amount received under the settlement to the dollar amount received in absence of its approval. If it is assumed hypothetically that Lumbard's total claim is at most $10,511,000, the Meritum estate would be receiving less under the settlement than it would were it to litigate and succeed on its claims in that amount. If to that sum is added the approximately $900,000 of Carla's scheduled unsecured claims, there would be total claims of $11.41 million of which Lumbard holds in excess of 90%. Under the settlement, Lumbard would be entitled to ⅚ of the amount recovered from the Lumbard action. He would also be entitled to his prorata share of the remaining 1/6th but

---

**6.** Drucker asserts that Lumbard's claim must reflect the debt reduction and conversion provided for by the April 1982 Agreement. It is conceded, however, that Carla failed to issue the stock called for by that agreement. That conclusion does not conflict with the interest on interest analysis already set forth. The reaffirmation of the debt in the April 1982 Agreement validly supports the account stated clause of the November 1978 Agreement and constitutes ex-

actly the express agreement by the obligor to pay interest on interest, supported by the lender's forebearance, as required by *Newburger-Morris*. That the agreement was subsequently breached does not deprive Lumbard of the debtor's concession of the amount due, being an acceptance of an account stated under *Newburger-Morris*. *See* S. Williston, *Williston on Contracts,* § 1305 (5th ed. 1954).

would not be entitled to share in the first $250,000 that the recovery produced for the Carla estate. The other Carla creditors would be entitled to $250,000 plus their share of the excess. This amount far exceeds the amount that Carla's other unsecured creditors would recover were the settlement *not* approved and Lumbard's claim limited to the minimum amount that the foregoing analysis would suggest. Thus seen, the settlement is clearly within the bounds of reasonableness.

### B. *Complexity and Delay*

The extent of this analysis is itself indicative of the complexity of the issues raised by Lumbard's claim. On this record, moreover, that indication gives no hint of the additional difficulties the Trustee faces in contesting the claim. The uncontradicted evidence here is that the Carla books and records already examined by Green's accountant are in some disarray and there is not a scrap of evidence indicating that those not yet examined are in better shape. For Green to contest Lumbard's claim would require reconstruction of those books and records at considerable expense for an estate with stated assets of only $2,500. In addition, the settlement serves to obviate delay in pursuing the one potentially significant asset that Carla possesses, namely the claims asserted by Lumbard which actually belong to Carla.

Resolution of Lumbard's claim in this proceeding, as Green determined, and the sharing provisions of the settlement as outlined above, will allow administration to proceed smoothly without the need for complex litigation. It thus furthers a salutory goal of Bankruptcy administration where

> Liquidation is to be accomplished as rapidly as possible consistent with obtaining the best possible realization upon the

available assets and without undue waste by needless or fruitless litigation.

*In re Blair,* 538 F.2d 849, 852 (9th Cir. 1976).

To these concerns it is no answer to criticize the legal basis for the Lumbard action and thereby, in effect, assert that delay is meaningless. Drucker attempts to make that point by observing that under recent Second Circuit decisions Lumbard's pursuit of RICO violations may be precluded. *Furman v. Cirrito,* 741 F.2d 524 (2d Cir.1984); *Banker's Trust Co. v. Rhoades,* 741 F.2d 511 (2d Cir.1984); *Sedima, S.P. R.L. v. Imrex Co. Inc.,* 741 F.2d 482 (2d Cir.1984). This issue is to be decided by the district court. Regardless of its resolution, the settlement seems to provide for division of a recovery from the Lumbard Complaint's viable causes of action wherever pursued.

### C. *Best Interests of Creditors*

It is thus readily apparent that the settlement is in the best interests of creditors. Yet it is objected to on the grounds that it provides for an allowance of a claim in an amount in excess of an amount attributable to considerations involving usury or the compounding of interest and attributable to inclusion of the approximately $1.25 million that on this record appears to be owed by Drucker and Vaisman and not by Carla.[7]

It would seem that it could hardly be in the best interests of creditors to allow a creditor's claim in excess of the amount actually owed. In this unique case, however, Lumbard's claim makes up the predominant portion of Carla's total debt. Such allowance would thus appear to have little if any impact on Carla's other creditors, who will thereby be entitled to the first $250,000 plus 16.7% of the remainder, whereas they only hold claims equalling or

---

7. Lumbard and Green have offered no explanation why Meritum should not be bound by the June 1981 forgiveness of one million dollars and the subsequent interest charged on that amount, which according to Lumbard was the basis of his agreement to settle at $10.8 million.

Whether the sums identified as being owed by Drucker and Vaisman are the same sums they assumed in June 1981, or are in addition thereto, is not clear from this record. If they are the same, the excess is approximately $300,000.

an approximate 11% of the debt.[8] Only the guarantors of the debt owed by Carla to Meritum would be prejudiced. Since Green proceeded on the notion that fixing a dollar amount was largely immaterial and consideration of a settlement does not contemplate full resolution of all underlying issues, it is enough merely to protect the guarantors by enabling them to litigate fully the amount Carla actually owed and, accordingly, the amount of potential liability they face with respect to those guarantees.

Also insufficient is Drucker's assertion that Green's investigation of the settlement was inadequate. He primarily observes that Green did not interview him or Vaisman and that Green's accountant, Mr. Rosman, did not look at certain Carla records in storage.

■■■■ There can be no question that a trustee's judgment in proposing a settlement is to be informed. *Matter of W.T. Grant Co.,* 4 B.R. 53, 620 F.2d 319 (Bankr. S.D.N.Y.1980); *aff'd* 20 B.R. 186 (S.D.N.Y., 1982); *In re Blair,* 538 F.2d 849 (9th Cir. 1976). Yet it is not suggested that a trustee, in informing himself, is to explore every possible fact without regard to the cost to the estate of doing so or to the potential benefit to be achieved. One of the trustee's concurrent duties is that

of expeditiously liquidating the estate and avoiding all unreasonable expense either in its preservation or distribution.

*Rife v. Ruble,* 107 F.2d 84, 86 (6th Cir. 1939). In pursuing litigation in the name of the debtor, the trustee's

obligation is not that he should burden the assets of the estate with costs and expenses arising out of all manner of questions that may be presented for litigation.

*In re Meadows, Williams & Co.,* 181 Fed. 911 (D.C.N.Y.1910). From this it follows that a trustee is to exercise prudence and at the same time be in a position so to act

on a settlement opportunity when that opportunity arises.

Under this standard, Green's investigation was more than adequate. His conversations with attorneys for parties on each side of the Lumbard action informed him of their claims and defenses. His accountant was able to tie in the Meritum loan records to the amount Carla, then under the control of Drucker and Vaisman, had agreed was due as of December 31, 1981. In these circumstances, Drucker, should have come forth with at least some indication of those facts he asserts that Green would have uncovered through inquiry of him and Vaisman.

To allow objectors to disrupt settlements by merely objecting,

without demonstrating any factual basis for their objections, and force the parties to expend large amounts of time, money and effort to answer their rhetorical questions, not withstanding the copious discovery available from years of prior litigation and extensive pre-trial proceedings [would] thwart the settlement process . . . .

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 464 (2d Cir.1974).

### V.

Also lacking in merit are Drucker's contentions that approval of the settlement should be denied because Green allegedly overstepped his authority as interim trustee in its negotiation and that Green, if he is to serve as Carla's permanent trustee, should be removed "for cause" under § 324 of the Code. In support of both these points, Drucker claims that Green, in settling the Carla-Meritum dispute, placed himself in a position of conflict and that "it was bizarre" to do so on the eve of the creditors' election of a permanent trustee.

■■■ An "interim trustee has the powers and duties and must comply with the same rules and regulations as a permanent trustee." L. King, M. Cook, R. D'Agostino & K. Klee, *Collier on Bankruptcy,* ¶ 701.-

---

**8.** In this no weight is given to Lumbard's characterization as a wholly secured creditor. In this case where assets are listed at $2,500, he is largely unsecured under § 506 of the Code.

04 (15th ed. 1984). Although his or her appointment is temporary in nature, his powers encompass the ability to negotiate settlements.

■ The wisdom of exercising those powers necessarily varies from case to case. As a general proposition, it may be that an interim trustee should primarily focus on protecting the estate from erosion and asserting control over estate property. But there may well be cases where it is desirable for an interim trustee to posture the case so that administration can proceed and causes of action belonging to the estate can be litigated expeditiously. In each case, that judgment is to be exercised by the interim trustee. It should be disturbed only upon evidence of abuse.

The record here is barren of such evidence. Indeed, upon being asked at the hearing whether he contends that "as a matter of fact [Green] sold his birthright?", Drucker's counsel replied "that is correct, I have no intimation whatsoever of anything like that on the part of Mr. Green." (Tr. 108, 23–25; 109, 2–4). Furthermore, Drucker's contention that Green negotiated the settlement on the eve of the election is palpably erroneous. The election was held on July 25, 1984, Green and Lumbard reached their agreement on June 22, 1984 and reported their having done so to the district court on that date.[9]

■ The pendency of that pre-trial hearing sufficiently controverts Drucker's assertion that Green acted with undue haste. The parties to that litigation, including Lumbard as trustee of Meritum's estate, and Green, as interim trustee of Carla's estate, were obligated to conduct themselves so as to assist the district court in both its handling of the Lumbard action and its managing its calendar. The need of both trustees to proceed with that litigation and bring it to a conclusion, together with the need to confront the possibility of a stay raised by Carla's bankruptcy before reaching the merits of Carla's claims in the

district court, justified Green in having proceeded with the settlement. Particularly is this so where the creditors of the Carla estate are protected by the opportunity to be heard before this Court prior to the finalization of any settlement.

Such expedition may require the bankruptcy court to examine the settlement in great depth, but does not require disapproval. Nor does it constitute cause for Green's removal. To be sure, "the conduct of bankruptcy proceedings not only should be right but must seem right." *In re Ira Haupt & Co.*, 361 F.2d 164 (2d Cir.1966). But that salutory principal is not denigrated by an interim trustee's proceeding to advance the interests of the estate by freeing the causes of action constituting its main asset from procedural entanglement and negotiating a settlement of benefit to creditors. *Ira Haupt* itself indicates that upon being presented with prior acts that might have been disapproved of prospectively, which is not the case here, the court, rather than respond in the knee jerk fashion proposed by Drucker, should consider whether, "the obvious detriment to the estate from now making a change would far outweigh any theoretical possibility of benefit." *Id.* at 169.

Moreover, the requirement of § 324 of the Code that cause be shown before a trustee is removed demands far more than the unsupported inferences alleged by Drucker. In the enforcement of that concept under both § 2a(17) of the Bankruptcy Act and § 324 of the Code, the courts have required a strong showing "because the effect of removal is deleterious to the continuity of the administration of the estate". L. King, K. Klee, R. Levin, H. Miller & P. Murphy, 2 *Collier on Bankruptcy*, ¶ 324.-02 (15th ed. 1984). Accordingly, the most common grounds for trustee removal are where the trustee is found incompetent or unwilling to perform his duties, he violated the fiduciary duty he owed to the estate by action for his own benefit or he was found

---

**9.** That the settlement enabled Lumbard to vote at the § 341(a) meeting is of little consequence. His claim could have been temporarily allowed for voting purposes pursuant to Section 702 of the Code upon analysis similar to that in Point IV of this opinion.

to have an interest adverse to the welfare of the estate. 2 *Collier on Bankruptcy*, § 324.02 (15th ed.) In accord is *Matter of Lucio F. Russo*, 18 B.R. 257 (E.D.N.Y. 1982), upon which Drucker relies. There the trustee had dual interests of representing creditors both generally and as executor and residuary beneficiary of an individual judgment creditor's estate, that of his father.

■■■ A trustee, as a fiduciary· is "held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928). The evidence here shows that Green satisfied that standard.

### VI.

■■■ In addition to seeking this Court's authorization to enter into the settlement, Green requests permission to employ Lumbard's attorneys, Cleary, as special counsel for the limited purpose of pursuing any and all claims arising out of or related to allegations in the Lumbard Complaint. Drucker objects, asserting that Cleary would have a conflict of interest.

His objection is without merit. Section 327(e) of the Code permits a trustee, "with the court's approval", to employ an attorney for a specified special purpose if such employment is

in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter in which such attorney is to be employed.

Unlike § 327(c) of the Code which bars a trustee's engagement of regular or general counsel who also represents a creditor, § 327(e) bars engagement of special counsel only in the presence of an actual conflict of interest concerning the subject matter of the engagement. *In re Iorizzo*, # CU 83–5512 (E.D.N.Y. Aug. 20, 1984) (unreported); *In re Fondiller*, 15 B.R. 890,

8 B.C.D. 532, 5 C.B.C.2d 1134, (BAP 9th Cir.1981).

*Iorizzo* is illustrative. There a trustee sought to recover fraudulent conveyances. The attorney he engaged had, in his role as counsel to a trustee in another bankruptcy case, accused the Iorizzos of fraudulently conveying and concealing assets belonging to that estate. Questions concerning interstate claims and division of recovery were not resolved. The court, nevertheless, found no violation of Canons Four, Five and Nine of the Code of Professional Responsibility and held that the retention was authorized by § 327(e) and in the best interests of creditors:

Although it might be preferable to avoid every possibility of conflict of interest by appointing separate counsel for each estate, the realities of the bankruptcy process require the court to view the situation in a more practical light. No actual conflicts of interest with respect to the recovery of assets have been noted. The statements cited by appellants as representing hostility to the Iorizzos and dilution of loyalty by special counsel were directed against the Iorizzos individually and not against their estates. It is clear that the Iorizzos are primarily concerned with thwarting every attempt to ascertain the extent of their assets while the trustee of the estate is most concerned with the recovery of assets. The trustee of the Iorizzo estate cannot protect and defend the Iorizzo estate from the claims of vantage and the other related estates until those assets are recovered. The attempts of the Iorizzos to disqualify the individual who has most successfully investigated the assets of all the debtors and to deplete the remaining assets by retaining additional counsel and duplicating and confusing the efforts of Mr. Backenroth are additional reasons for finding that the retention of special counsel is in the best interest of all the estates involved.

*Iorrizo*, # CU 83–5512 at 6–7.[10]

Unlike *In re Stancraft Corp.*, 39 B.R. 748 (Bankr.E.D.Va.1984) where an actual

---

**10.** On July 10, 1984, § 327(c) was amended by P.L. 98–353 to exclude the *"per se"* bar of multi-

conflict was shown, the Carla/Meritum settlement removes any actual and potential conflict of interest. Absent the settlement the Cleary firm could well have been conflicted. Deciding among causes of action to pursue at trial and how the recovery should have been allocated would have put it in the untenable position of having to choose between clients. The settlement resolves these issues by splitting the recovery by a set formula regardless of source.

This case is thus freer of potential conflicts than *Iorrizo*. It is remarkably similar to *Iorrizo* in that Drucker is concerned with defending himself in the Lumbard action while seeking to disqualify the attorney who has investigated the matters there complained of. As in *Iorrizo* and in the comparable situation presented in *Fondiller*, it is here in the best interests of creditors of the estate that the law firm be retained. Green should avail himself of Cleary's investigation and its resulting expertise so to avoid the cost and time of finding and educating new counsel as well as to obviate possibilities of unnecessary confusion in the prosecution of Lumbard's Complaint.

### Conclusion

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052. Other objections raised to the settlement, to Green's serving as trustee or to his engagement of special counsel are without merit and need not be discussed. The motion to confirm Green as trustee, to engage Cleary as special counsel and to approve the settlement should be granted. The motion to disqualify Green should be denied.

SETTLE ORDER.

ple representation and requiring the disapproval only if there is an actual conflict of interest. The amendment applies to cases filed on or after October 8, 1984 P.L. 98–353, § 553(a), (1983) and would seem to support *Fondiller's* reading of § 327(c). *See also In re OPM Leasing Services, Inc.,* 16 B.R. 932, 941 (Bankr.S.D.N.Y. 1982) where this Court observed that attempts to disqualify a trustee's attorney

should be undertaken with considerable circumspection and reluctance as disqualification has an immediate adverse effect on the administration of a bankrupt estate and because such motions are often interposed for tactical purposes.