Stella WEISS, a/k/a Stella Ydowitz, Plaintiff,

v.

DREW NATIONAL CORPORATION, Hertz Herson & Company, Harold Aibel, Lawrence Aibel, James Corines, Norman Elson, Murray Gains, Harry L. Goldberg, Herbert Kdrasnow, Lewis C. Leighton, I. H. Plone, Jerry Pressman, Sol Schalman, Seymour Schwartz, Michael J. Maloney and Leigh J. Abrams, Defendants.

No. 75 Civ. 4816.

United States District Court, S. D. New York.

Feb. 8, 1979.

Law Firm of Arthur N. Abbey, New York City, Milberg Weiss, Bershad & Specthrie, New York City, Crystal & Driscoll, P.C., New York City, Martin H. Philip, Palmerton, Pa., Booth, Lipton & Lipton, New York City, for plaintiffs.

D'Amato & Lynch, New York City, by Richard G. McGahren, New York City, of counsel; Cole & Dietz, New York City, by Robert E. Kushner, New York City, of counsel, for defendants.

## OPINION

SWEET, District Judge.

Plaintiffs and their attorneys in this class action have submitted a petition pursuant to Rule 23(e), Fed.R.Civ.P., and in accordance with Civil Rule 11B of the Local Rules of the Southern District of New York, seeking approval of a proposed settlement, an award of attorney's fees, and reimbursement of expenses.

Plaintiffs alleged violations by the defendants of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, in that defendants made false and misleading statements in various reports and releases issued by Drew National Corporation ("Drew") to its stockholders and the public, and which were filed with the Securities and Exchange Commission. This action is a consolidation of four separate security class actions naming Drew, its directors, and auditor Hertz Herson & Company as defendants, and charging them with making overly optimistic statements as to Drew's earnings and assets while understating its liabilities.[1]

Settlement papers were executed by attorneys for all parties on October 16, 1978, a settlement in principle having been achieved on the eve of trial. On October 22, 1978, this court approved the giving of notice of the proposed settlement to the

---

[1]. The original actions were: *Shindler v. Drew*, 75 Civ. 1594, commenced in April, 1975; *Weiss v. Drew*, 75 Civ. 4816, commenced in October, 1975; *Mittleman v. Hertz Herson*, 76 Civ. 2346, originally commenced in Pennsylvania in November, 1975 and removed to this district; and *Kane v. Aibel*, 76 Civ. 250, commenced in January, 1976.

class by mail and by publication in the Wall Street Journal. Notice was given to all class members who received the notice of pendency of the class action in 1977.

■■■ Approval of a proposed settlement of a class action is given if the settlement is fair, reasonable, and adequate. *City of Detroit v. Grinnell Corporation*, 356 F.Supp. 1380 (D.C.), *aff'd in part, reversed in part on other grounds*, 495 F.2d 448 (2d Cir. 1974). The proponents of the settlement have the initial burden of showing: (1) that the settlement was arrived at through arms' length negotiation and is not collusive; (2) that the proponents are counsel experienced in similar cases; (3) that there has been sufficient discovery to enable counsel to act intelligently; and, (4) that the number of objectants or their relative interest is small. *Munsey Trust v. Sycor, Inc., et al.*, 457 F.Supp. 924 (S.D.N.Y.1978); *Burger v. C.P.C. International, Inc.*, 76 F.R.D. 183 (S.D.N.Y.1977).

■■■ This court is satisfied that the proposed settlement is not the result of collusion, and that counsel with ample experience have evaluated their positions intelligently, following thorough discovery. Moreover, petitioning counsel Arthur Abbey has represented that no written objections to the settlement have been served on petitioner, and that he knows of no one expressing an interest in so objecting. The absence of objectants may itself be taken as evidencing the fairness of the settlement. *City of Detroit v. Grinnell Corporation*, 495 F.2d 448, 462; *Burger v. C.P.C. International, Inc.*, 76 F.R.D. at 186. In light of the foregoing, therefore, a presumption arises in favor of the settlement, *Id.; see also Feder v. Harrington*, 58 F.R.D. 171, 174–75 (S.D.N.Y.1972).

■■■ The fairness of the proposed settlement must nonetheless be judged with reference to the strength of the plaintiffs' case, as balanced against the amount offered in the settlement. *Protective Committee for Independent Stockholders of*

*TMT Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *City of Detroit v. Grinnell Corporation, supra; Burger v. C.P.C. International, Inc., supra*. Certain of the elements of plaintiffs' Rule 10b–5 action present difficult questions of law and fact, particularly insofar as plaintiffs must prove the materiality of defendants' allegedly false statements and omissions; plaintiffs also bear the burden of proving defendants' scienter. *See Munsey Trust v. Sycor, Inc., et al., supra; Burger v. C.P.C. International, Inc., supra*.

While it is unnecessary to " 'balance the scales with the nicety of an apothecary'," *Glicken v. Bradford*, 35 F.R.D. 144, 152 (S.D.N.Y.1964), a proper evaluation normally includes an estimate of the potential recovery, assuming success at trial. *See Burger v. C.P.C. International, Inc.*, 76 F.R.D. at 186–87. While detailing the merits of their claims, the risks of litigation, and the benefits of the settlement, plaintiffs have not given an evaluation of their anticipated recovery at trial: they mention only that the issue of damages presents "troublesome questions."[2]

■ Despite this omission, the court approves the proposed settlement, while noting the peculiar difficulties in estimating a potential recovery figure in this case. The difficulty at trial in establishing the effects of the alleged misstatements and omissions upon the "true value" of Drew stock is obvious. The present bankrupt status of Drew deepens the problem, as is exemplified by the erratic performance of Drew stock since the initial settlement date.[3]

Plaintiffs have outlined the strengths and weaknesses of their case in sufficient detail to apprise the court of the value of the proposed settlement to all members of the class. The lack of opposition to the settlement indicates that this case is properly the subject of our long-established policy of encouraging the out-of-court resolution of such controversies. *See Republic Nat. Life Ins. Co. v. Beasley*, 73 F.R.D. 658 (S.D.N.Y.

---

**2.** Plaintiffs' Memorandum in Support of Motion, pp. 13–14.

**3.** Plaintiffs' Petition, p. 29, footnote.

1977); *see also, Beecher v. Able*, 72 F.R.D. 518 (S.D.N.Y.1976), *modified*, 441 F.Supp. 426 (D.C.), *aff'd.*, 575 F.2d 1010 (2d Cir. 1978).

The court, therefore, finds that the proposed settlement—consisting of $1,210,000 in cash, 200,000 shares of Drew stock, and $12,500 toward the reimbursement of pre-settlement expenses—is fair, adequate, and reasonable.

### Attorneys' Fees and Expenses

The petitioning attorneys have submitted an application for an award of fees valued at approximately $365,000. Of that figure, $340,000 is to be paid in cash, with the remainder to be made up through the attorneys' acquisition of 200,000 shares of Drew stock. The stock was valued at $50,000 at the time of the initial settlement agreement, but diminished in value to $25,000 as of the November, 1978 filing date of this petition.[4]

■ In recent years the courts have set forth the relevant factors for reviewing attorneys' fee applications.[5] Courts must scrutinize fee applications with a jealous regard for the rights of those who are interested in the settlement fund. *City of Detroit v. Grinnell Corporation*, 495 F.2d at 469. "For the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that the courts should avoid awarding 'windfall fees' and that they should likewise avoid every appearance of having done so." *Id.*

■ With the Second Circuit's admonition in mind, "[i]t is now clear that the proper starting point for determining an award of counsel fees is the actual time spent by the attorneys, multiplied by a reasonable hourly rate to which attorneys of like skill in the area would typically be entitled for a comparable type of work." *Burger v. C.P.C. International, Inc.*, 76 F.R.D. at 188, *citing City of Detroit v. Grin-*

*nell Corporation*, 495 F.2d at 471; *see also Barnett v. Pritzker*, 73 F.R.D. 430, 431 (S.D. N.Y.1977). The court is mindful that this practice "may at times result in rewarding inefficiency or the luxurious practice of [the] law and penalizing those who are efficient and expeditious in performing their legal tasks," *Blank v. Talley Industries, Inc.*, 390 F.Supp. 1, 5 (S.D.N.Y.1975). Nonetheless, "it is only after such a calculation [is made] that other, less objective factors, can be introduced into the calculus." *City of Detroit v. Grinnell Corporation*, 495 F.2d at 471.

■ Plaintiffs' counsel have provided the court with figures for their hours worked; they submit a base, or "lodestar" figure of $324,161.50, arrived at by multiplying hours worked times non-contingency hourly rates. There is no evidence suggesting that the "lodestar" figure represents duplicative or otherwise wasteful effort. Similarly, the quality of counsel's work is not questioned. However, the court must reject counsel's use of their current non-contingency rates; the rates which were in effect at the time the services were rendered are the appropriate rates for calculating the "lodestar" figure.

Counsel cite *City of New York v. Darling-Delaware*, 440 F.Supp. 1132 (S.D.N.Y. 1977) for the proposition that current rates are appropriate. However, the extraordinary nature of that protracted antitrust case, which took seven years to complete, cannot be overlooked. It is true that counsel are forced to endure certain hardships in waiting until the conclusion of a case to receive any compensation. But this is a factor better left to the court's consideration of a contingency or "risk factor" bonus, and it should not find presence in the calculation of the "lodestar" figure itself. In *In re Equity Funding Corporation of America Securities*, 438 F.Supp. 1303 (S.D.Cal.1977), the court noted the following: "It is clear from cases such as *Lindy* [*Bros. Builders,*

4. *Id.*

5. *See, e. g., Transworld Airlines, Inc. v. Hughes*, 312 F.Supp. 478, at 480 (S.D.N.Y.

1970), in which nine relevant factors were cited. In *City of Detroit v. Grinnell Corporation*, 495 F.2d 448 (1974), the Second Circuit questioned the validity of the *Transworld* approach.

*Inc. v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976), *Lindy II*] that at least a portion of any contingency multiplier includes consideration of the fact that counsel have suffered a delay in the payment for services rendered." *In re Equity Funding Corporation of America Securities*, 438 F.Supp. at 1331, citing *Lindy II*, 540 F.2d at 117.

The Second Circuit's language in *City of Detroit v. Grinnell Corporation, supra*, in referring to "the hourly amount to which attorneys of like skill in the area would typically be entitled," *id.*, at 471, supports the use of rates to which attorneys would be entitled at the time the services were rendered. Moreover, that case required a particularized review of attorneys' fees, including differentiation between attorneys' qualifications, their work, and their use of paraprofessional help.

■ Explicit demonstration of the application of historical rates is made in *Kane v. Martin Paint Stores, Inc.*, 439 F.Supp. 1054 (S.D.N.Y.1977), in which the court awarded different rates through the years 1971 to 1976. *Id.* at 1056–57. In *Kane* the court noted that the attorneys' failure to keep more precise records is a factor to be considered in computing fees. "The attendant uncertainties that thereby arise should, in fairness, be resolved against the petitioner." *Id.*, at 1056. The failure of counsel in the instant case to provide information concerning their rates at the time of the performance of the services will, therefore, be resolved by the court as follows: in arriving at a "lodestar" figure, the appropriate hourly rates for attorneys doing similar work will be averaged out over the three year period of this litigation. This reduction is not meant in any sense to impugn counsel's character, for, indeed, counsel brought the issue to the court's attention. The time-averaged rates adopted by the court reflect an appreciation for the highest quality work (see Appendix).

■ The "lodestar" figure thus arrived at is $276,487.00. In determining how great the contingency multiplier, or risk factor bonus, should be, the court notes that the greater the probability of success on the merits, the less this factor should increase the award. *City of Detroit v. Grinnell Corporation*, 495 F.2d at 471; *Munsey Trust v. Sycor, Inc.*, 457 F.Supp. 924 at 928. There is, in general, no reason to consider this case an unusually complex one, nor one of extraordinary magnitude. Moreover, plaintiffs' counsel did receive some benefit from government actions brought by the Securities and Exchange Commission against Drew in 1975. The S.E.C. also commenced a Rule 2(e) administrative hearing against Hertz Herson on related matters. To be sure, these matters included issues both related and unrelated to plaintiffs' claims here, and resulted in consent judgments of little evidentiary value to plaintiffs. Nonetheless, the value of these actions in aiding plaintiffs refinement of their claims cannot be entirely overlooked.

Nonetheless, plaintiffs' counsel did endeavor long and hard over three years involving extensive discovery. As stated in *Munsey Trust v. Sycor, Inc., supra*, it should suffice "to say that issues of materiality, scienter, and damages were sharply disputed and increased the risk of litigation." *Id.* at 928. The court therefore finds it appropriate to employ a risk factor bonus of 15%.[6] This reflects the court's relief that the instant case falls somewhere in between the high risks involved in *Munsey Trust v. Sycor, Inc., supra*, and *Burger v. C.P.C. International, Inc., supra*, (awarding a 30% bonus in each case) and the minimized risks found to be present in *Kane v. Martin Paint Stores, Inc., supra* (no contingency bonus allowed).

In applying the risk factor bonus to the "lodestar" rate, hours spent on non-risk services, such as the approval of the settlement and application for attorneys' fees,

---

**6.** Counsel have suggested that a 13% risk factor bonus would be sufficient, though only if taken in conjunction with their significantly higher "lodestar" figure. It is apparent that counsel provide no reason to believe that 13% is an appropriate figure, except that the arithmetic simply worked out that way.

will be separated out from the figure subject to the 15% bonus. *See Munsey Trust v. Sycor, Inc., supra,* and *Burger v. C.P.C. International, Inc., supra.*

It is assumed that the attorneys with the highest rates did the settlement and fee approval work. *See, Kane v. Martin Paint Stores, Inc.,* 439 F.Supp. 1056–57; this seems particularly fair since the petition and its memorandum were submitted by Mr. Abbey, whose rates are the highest awarded.

The resultant attorneys' fee award of $316,348, derived as shown in the Appendix, represents 25.3% of the total settlement in the case. Though somewhat lower than the 29.3% requested by counsel, the award remains within the middle range of those customarily approved. "Traditionally, courts in this district and elsewhere have awarded fees in the range of 20% to 30% of the recovery." *Rosenfeld v. Black,* 56 F.R.D. 604, 605–06 (S.D.N.Y.1972). Though such considerations of percentage are no longer of overriding importance as the law turns its primary concern to hourly rates and contingency-risk factors, the court may nonetheless derive assurance from the fact that its award is a moderate one.

■ In reviewing the costs submitted for expert witnesses, plaintiffs' petition reveals that both Mr. Gunther and Mr. Shinagel have charged rates which were in effect at the time their services were rendered. Their disbursements and fees—$52,787.44 for Mr. Gunther and $13,200 for Mr. Shinagel—are therefore approved. Lastly, the court grants approval for the payment of $21,980 in expenses and disbursements claimed by plaintiffs' attorneys.

Accordingly, the petition for approval of the settlement is granted. In light of the foregoing, and on the basis of the calculations set forth in the Appendix, the court concludes that attorneys' fees of $316,348, and disbursements of $21,980, as well as expert witness fees and expenses totalling $65,987.44, are reasonable and fair in this class action.

IT IS SO ORDERED:

## APPENDIX

I  Hours Spent × Non-Contingency Rates

| Names of Attorneys | Hourly Rates | Hours | Totals |
|---|---|---|---|
| Weiss and Abbey | $125 | 1,182.30 | $147,787.50 |
| Bershod, Pierce, Crystal | 105 | 232.00 | 24,360.00 |
| Phillip | 85 | 95.50 | 8,117.50 |
| Rodd | 80 | 1,178.40 | 94,272.00 |
| Gershon | 75 | 26.00 | 1,950.00 |
| | GRAND TOTAL | | $276,487.00 |

II

A  Fees Subject to Contingency/Risk Factor Bonus

| | Hourly Rates | Hours | Total |
|---|---|---|---|
| | (See I above) | 2,628.20 | $265,737.00 |

B  Fees Not Subject to Bonus

| | Hourly Rate | Hours | Total |
|---|---|---|---|
| | $125 | 86.00 | $10,750.00 |

C  Expenses and Disbursements by Counsel

$21,980.00

D  Award

1.

| | | |
|---|---|---|
| a. | Fees Subject to Bonus | $265,737.00 |
| b. | 15% Risk Factor Bonus | 39,861.00 |
| c. | Fees Not Subject to Bonus | 10,750.00 |
| | TOTAL FEE AWARD | $316,348.00 |

II—Cont'd
  D  Award—Cont'd
    2.
      a.  Expenses and Disbursements                    $ 21,980.00
                          TOTAL AWARD                    $338,328.00

  E  Expert Witnesses, Fees and Disbursements
      Gunther                                            $52,787.44
      Shinagel                                            13,200.00
                                    TOTAL                $65,987.44