**In re DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.**

No. M.D.L. No. 378.

United States District Court, D. Kansas.

April 24, 1987.

Theodore A. Miles, Principal Deputy Sol., Marcia K. Sowles Stephen C. Skubel, Dept. of Energy, Economic Regulatory Admin., Washington, D.C., for Dept. of Energy.

Jerry Cohen, Patricia Bak, Cohen, Milstein & Hausfeld, Washington, D.C., for Retailers.

Jacob Dweck, Beverly Rudy, Milgrim, Thomajan, & Lee, P.C., Washington, D.C., for Agr. Cooperatives.

Richard T. Williams, Kadison, Pfaelzer, Woodward, Quinn & Rossi, Los Angeles, Cal., for Airlines.

Philip P. Kalodner, Gladwyne, Pa., for Surface Transporters.

Harold E. Kohn, Joseph C. Kohn, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., for Utilities.

Francis X. Bellotti, Atty. Gen., George B. Dean, Asst. Atty. Gen., Boston, Mass., Dave Frohnmayer, Atty. Gen., Donald C. Arnold, Chief Counsel, State of Or., Dept. of Justice, Salem, Or., John Van de Kamp, Atty. Gen., Yeoryios C. Apallas, Deputy Atty. Gen., San Francisco, Cal., Bernard Nash, Edward G. Modell, Blum, Nash & Railsback, James F. Flug, Paula Dinerstein, Lobel, Novins, Lamont & Flug, Washington, D.C., LeRoy S. Zimmerman, Atty. Gen., Eugene F. Waye, Kathleen M. Gingrich, Deputy Attys. Gen., Harrisburg, Pa., Jim Mattox, Atty. Gen., Larry J. Laurent, Sp. Asst. Atty. Gen., Austin, Tex., James R. Murphy, Acting Corp. Counsel, D.E., Doreen E. Thompson, Asst. Corp. Counsel D.C., Chief, Trade Regulation Section, Washington, D.C., for States Negotiating Committee.

Joseph W. Kennedy, Witchita, Kan., for plaintiffs.

## OPINION AND ORDER

THEIS, District Judge.

This matter is presently before the Court on the motion of Philip P. Kalodner for an order approving the disbursement of attorney fees and expenses from the Surface Transporters Escrow. Kalodner has requested $850,000.00, the full amount of fees authorized by Paragraph 5.4 of the Surface Transporters Escrow Order.

In his initial fee petition, filed on September 29, 1986, Kalodner submitted only an aggregate monthly number of hours for "in excess of 3,560" hours of work performed between 1983 and 1986. Dk. no. 895. No indication of what type of work was performed was included in the initial fee request petition. In addition, Kalodner estimated that he spent an extra 750 hours of completely unrecorded time. At Kalodner's customary billing rate of $175 per hour, the total of 4,310 hours would be billed for an amount in excess of $754,-000.00. Kalodner also requested $111,-259.70 as his pro rata share of expenses

incurred jointly with Kohn, Savett, Klein & Graf, P.C. Since the amount claimed for attorney fees plus expenses exceeds the maximum $850,000.00 ceiling prescribed by the Surface Transporters Escrow Order, Kalodner has requested that the Court order disbursement of $850,000.00.

The Court made several phone calls to Kalodner requesting an itemized and detailed compendium of work performed. The itemized fee petition which Kalodner submitted several months later at the Court's request delineates work performed in half hour segments only. Dk. no. 993. Again, the supplementary itemized compendium does not include the 750 hours of unrecorded-but-billed time. Furthermore, the supplementary billing records submitted by Kalodner were, apparently, inadvertently, minus several months: January of 1983, January of 1984, and part of August of 1984.

On March 20, 1987, Kalodner filed a Supplemental Declaration with respect to his time expended in this and other related litigation. Dk. no. 1056. Apparently, after reading this Court's opinion granting the fees and expenses of Bassman, Mitchell and Alfano, which established the standards the Court is employing in all fee petitions in this case, Kalodner became concerned that the Court would not award him the full amount of his fee request, fearing that the Court would disallow fees for work in the *Exxon* litigation. Thus, Kalodner reevaluated his billable but unrecorded time, and adjusted the time upward from 750 to 1500 hours. In addition, he requested a multiplier of 1.3 be applied to his entire fee. Kalodner also submitted an Errata to cure the inadvertent errors mentioned above. Dk. no. 1057.

## I. STANDARDS FOR EVALUATION OF FEE AND EXPENSE PETITIONS

While the Court is issuing separate orders with respect to the fee requests made by Bassman, Mitchell and Alfano, by Kalodner, and by Kohn, Savett, Klein & Graf, the Court is employing the same standards in the evaluation of all of the fee petitions.

### A. Settlement Agreement Provision

Paragraph 5.4 of the Surface Transporters Escrow Order authorizes the Escrow Agent:

To disburse to Philip P. Kalodner such amounts as shall be awarded by the Court for attorneys fees and expenses for services rendered both to the Surface Transporters Claimants ... and to other participants in the settlement by virtue of (i) his efforts in the M.D.L. 378 proceeding and other judicial and administrative proceedings to maximize Alleged Crude Oil Violation recoveries and (ii) his efforts in the development of the OHA record in M.D.L. 378 which helped to advance this Settlement. The amount of $850,000 has been included in the amount to be distributed to this Escrow fund specifically for said fees and expenses which shall not exceed that amount, to which there shall be added interest earned thereon pursuant to II.B.1.c. of the Settlement Agreement and in the Escrow Fund after its establishment.

### B. Court Discretion in Reviewing Fee Petitions

The provision of the Surface Transporters Escrow Order authorizing attorney fees clearly contemplates Court review of the fee petition. In its Opinion and Order approving the Settlement Agreement, this Court recognized its responsibility to evaluate attorney fee petitions. Dk. no. 858, p. 33. Case law supports the proposition that district courts must scrutinize fee applications, particularly in the context of settlements in which attorney fees come from the settlement funds. *See, e.g., Foster v. Boise–Cascade*, 577 F.2d 335 (5th Cir.1978); *In re Gas Meters Antitrust Litigation*, 500 F.Supp. 956 (E.D.Pa.1980); *Weiss v. Drew National Corp.*, 465 F.Supp. 548 (S.D.N.Y.1979).

### C. Criteria for Evaluation of Fee Petitions

In *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984), and *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40

(1983), the Supreme Court emphasized that the "basic standard" for finding reasonable fees is the determination of reasonable hours and rates. *Blum*, 465 U.S. at 898, 104 S.Ct. at 1548. The many factors for evaluating legal representation—such as the time and labor required, the novelty and difficulty of the questions, the results obtained, and so on—"usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley*, 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9. The fee applicant bears the burden of establishing his entitlement to an award and the burden of documenting the hours expended and the rates charged. *Id.* at 437, 103 S.Ct. at 1941. The district court should exclude from the fee calculation hours that, in the court's opinion, given its familiarity with the litigation, were not reasonably expended on the litigation. *City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 2691, 91 L.Ed.2d 466 (1986).

## II.  FEE APPLICATION OF KALODNER

### A.  *Chronology of Participation Submitted by Kalodner*

Kalodner served for three and a half years as Chief Enforcement Counsel of the Northeastern United States for the Department of Energy. The observations which impelled him to undertake the representation of motor vehicle users of refined products were as follows. Kalodner believed that motor vehicle users could not look to the State or Federal Governments for their protection, because the programs providing refunds to the States under the Warner Amendment were intended to benefit only the poor. In *United States v. Exxon*, Judge Flannery utilized the Warner Amendment as a model for awarding $2 billion of crude oil overcharge refunds to the States to fund programs for the poor. Also, Kalodner observed resellers and retailers persuading the Office of Hearings and Appeals ("OHA") that they had absorbed much of the burden of the oil overcharges and had not passed on the costs. Given this environment, Kalodner undertook the representation of motor vehicle

users of refined products, and joined forces with Kohn, Savett, Klein & Graf ("Kohn"), who undertook the representation of stockholders and customers of electric utilities which consumed oil.

Since Congress and some courts (in *United States v. Exxon* and *United States v. Sutton*) had made substantial awards to the States, Kalodner assisted in efforts to have the Warner Amendment declared unconstitutional and to overturn the *Exxon* and *Sutton* decisions. In M.D.L. 378 and before the OHA, Kalodner notes that he pressed for restitution for end users. In M.D.L. 378, Kalodner states that he attempted to develop and present expert economic testimony demonstrating that the injury was to identifiable end user groups, and that he contested the arguments of those upstream such as refiners who claimed that they had borne the overcharges. Before OHA, Kalodner requested that OHA keep open the remedy issue in settled cases and urged OHA to develop a remedy that recognized motorist injury.

In cases in which courts had selected first purchaser remedies, Kalodner sought to overturn such awards. In M.D.L. 378, Kalodner contested the effort of Total to enforce the first purchaser injunction as written. In *Diamond Shamrock Refining and Marketing Co. v. Standard Oil*, where first purchasers sought to obtain $100 million originally placed in this Court's escrow by Amoco and later returned to Amoco by court order, Kalodner undertook efforts to avoid award of the funds to the first purchasers. In *United States v. Hunt*, Kalodner attempted to reverse a district court determination to honor a first purchaser remedy in a DOE remedial order.

In situations in which the Federal Government attempted to deposit overcharge recoveries in the United States Treasury as miscellaneous receipts, Kalodner made efforts to challenge the DOE's Modified Restitutionary Policy and to prevent Congressional appropriation of crude oil overcharge refunds by lobbying Congress and by participating in the M.D.L. settlement. Kalodner also drafted com-

plaints to file in federal courts regarding the Treasury deposits.

In the M.D.L. settlement negotiations, it became apparent that only the larger commercial motor vehicle end users could receive direct refunds, and that restitution to the smaller commercial motor vehicle end users and to noncommercial motor vehicle end users would have to be accomplished by an award to the States. Kalodner and Kohn argued for and obtained the inclusion in the settlement agreement of a $10 million fund for the larger motor vehicle end users and of language requiring the States in developing their spending plans to recognize that almost one-half of the oil use in each state was by motor vehicle users.

Kalodner also submits that he attempted to maximize the pool of funds available for all participants. Four producers had entered into settlements with the DOE. Kalodner argued that certain language in the settlements reserved the right of DOE to insist on restitution to the M.D.L. funds. When DOE did not press for recovery of the funds, Kalodner filed motions to vacate this Court's dismissal orders. When DOE chose to exercise its rights to file motions to vacate, Kalodner filed supporting briefs. In two proposed remedial orders, the DOE did not assert what Kalodner thought was the maximum amount recoverable against Cities Service and Arco. Kalodner sought and received permission to participate in that litigation. In a third major case, involving Texaco, intervention was sought, but denied, and efforts to reverse that determination would have been undertaken on appeal, but for the intervention of the crude oil settlement. In a number of other crude oil cases, Kalodner filed comments on the inadequacy of DOE settlements.

Kalodner maintains that his efforts as counsel for motor vehicle end users were successful in the following ways. He obtained a $10 million fund for larger commercial motor vehicle end users. He obtained provisions in the Final Settlement Agreement imposing a requirement on the States to recognize the 45% motor vehicle use of oil products in designing restitutionary programs. He contends that he assist-

ed the DOE in its recovery efforts by initiating the legal strategy of motions to vacate dismissals against those who entered into global settlements with the DOE and by opposing the efforts of Arco and Cities Service to contest the proposed remedial orders issued to them by the DOE. He provided analysis and expert testimony limiting the refiners' portion to 7% of the crude oil overcharges and suggesting minimal injury to resellers and retailers. This analysis, according to Kalodner, provided an important element in obtaining the participation of these three groups in the settlement. Kalodner recognizes that not all of his specific efforts were successful, but suggests that but for his unsuccessful endeavors, the refiners and others would have been less willing to provide from the stripper funds for motor vehicle end users.

B. *Court's Observations Regarding Kalodner's Participation*

In evaluating Kalodner's fee petition, the Court refreshed its familiarity with Kalodner's work in this litigation by reviewing the docket sheet and the resolution of the motions filed in this case. The Court has compiled the following chronology:

1. Participation in the Multidistrict Litigation

January 31, 1983: Kalodner filed a motion to intervene and a memorandum in support of that motion on behalf of National Freight, Inc. ("NFI"). Dk. nos. 275, 276.

April 1, 1983: Kalodner and Kohn filed a consolidated memorandum in opposition to the DOE's motion to refer the remedy issue to the OHA. Dk. no. 348. [This motion was also opposed by a number of other parties. Dk. nos. 329, 333, 336, 343, 345, 346.]

April 1, 1983: Kalodner and Kohn filed a lengthy substantive memorandum in opposition to the motion of Total Petroleum for the distribution of escrowed funds. Dk. no. 349. [The DOE also filed a memorandum in opposition to Total's motion, which noted in two pages that Total's motion was premature and not in keeping with the scheduling order set by the Court. On September 13, 1983, the Court denied To-

tal's motion because it referred the remedy issue to the OHA—which was the extant issue on the scheduling order. Dk. no. 505.]

April 5, 1983: Kalodner and Kohn filed a consolidated answer to the motion for extension of time filed by the intervening refiners, who had requested additional time to oppose the DOE's motion to refer the remedy issue to the OHA. Dk. no. 382. [The Court granted the motion for extension of time, and the intervening refiners filed their response on June 22, 1983. Dk. no. 461.]

July 5, 1983: Kalodner and Kohn filed a consolidated memorandum in opposition to plaintiff's motion for relief from escrow accounting fees. Dk. no. 474.

July 6, 1983: Kalodner filed a motion for intervention on behalf of Geraldine H. Sweeney and a memorandum in support of that motion. Dk. nos. 475, 476.

July 6, 1983: Kalodner filed a motion for intervention on behalf of RJG Cab, Inc., and a memorandum in support of that motion. Dk. nos. 477, 478.

July 6, 1983: Kalodner filed a motion for intervention on behalf of RJG Cab, Inc., and a memorandum in support of that motion. Dk. nos. 477, 478.

July 6, 1983: Kalodner filed a motion for class certification on behalf of NFI and a memorandum of points and authorities in support of that motion. Dk. nos. 479, 480.

July 6, 1983: Kalodner filed a summary memorandum in support of his motions for intervention and class certification. Dk. no. 481.

July 20, 1983: Kalodner and Kohn filed a consolidated reply memorandum in opposition to the DOE's motion to refer the remedy issue. Dk. no. 490. [On September 13, 1983, the Court granted the DOE's motion to refer. Dk. no. 505.]

December 20, 1983: Kalodner and Kohn filed a consolidated response in opposition to the plaintiff's motion to certify the constitutional issues to the Temporary Emergency Court of Appeals ("TECA"). Dk. no. 524. A number of other parties also opposed the motion to certify. Dk. nos. 525,

526, 527, 529 [On January 25, 1984, the Court certified the constitutional issues to TECA. Dk. no. 539.]

January 10, 1984: Kalodner and Kohn filed a consolidated motion for a compulsory settlement conference and a motion for reconsideration of the Court's order referring the remedy issue to the OHA. Dk. no. 533.

January 31, 1984: Kalodner and Kohn filed a consolidated reply in support of their motion for a compulsory settlement conference and for reconsideration of the referral issue. Dk. no. 540. [On March 14, 1984, the Court denied these motions. Dk. no. 545.]

2. Motions to Vacate in Tagalong Cases

January 28, 1985: Kalodner and Kohn filed a motion to vacate the order of dismissal which was entered in *Waite v. DOE*, No. 78–1357, on January 13, 1981, and a memorandum in support of that motion. Dk. no. 18.

February 13, 1985: Kalodner and Kohn filed a supplemental memorandum in support of their motion to vacate in *Waite*. Dk. no. 19.

April 15, 1985: Kalodner and Kohn filed a motion to vacate the order of dismissal which was entered in *Union Oil Co. v. DOE*, No. 79–1318, on November 16, 1982. Dk. no. 13.

April 16, 1985: Kalodner and Kohn filed a motion to vacate the order of dismissal which was entered in *Johnson v. DOE*, No. 78–1140, on October 6, 1980. Dk. no. 19.

April 24, 1985: Kalodner and Kohn filed a reply brief in support of their motion to vacate the order of dismissal in *Waite*. Dk. no. 42.

May 13, 1985: Kalodner and Kohn filed a request for oral argument regarding their motion to vacate the dismissal in *Waite*. Dk. no. 43.

May 28, 1985: Kalodner and Kohn submitted a notice of a filing relevant to their motion to vacate the dismissal in *Waite*. Dk. no. 44.

June 3, 1985: Kalodner and Kohn filed a reply in support of their motion to vacate

the order of dismissal in *Union Oil.* Dk. no. 24.

June 3, 1985: Kalodner and Kohn filed a reply in support of their motion to vacate the order of dismissal in *Johnson.* Dk. no. 33.

July 9, 1985: Kalodner and Kohn filed a motion to vacate the order of dismissal which was entered in *Cities Service Co. v. DOE,* No. 78–1145, on January 7, 1981, and a memorandum in support of that motion. Dk. nos. 36, 37.

July 26, 1985: Kalodner and Kohn submitted a notice of an additional filing relevant to their motion to vacate the dismissal in *Waite.* Dk. no. 46.

September 16, 1985: Kalodner and Kohn filed a reply in support of their motion to vacate the order of dismissal in *Cities Service.* Dk. no. 44. [On December 30, 1985, the Court denied Kalodner's and Kohn's motions to vacate the orders of dismissal in *Waite, Johnson, Union Oil,* and *Cities Service,* on the basis that the movants lacked standing to make the motions. In each case the movants had been granted intervention in the multidistrict litigation, but not the individual cases (which intervention was granted for the limited purpose of addressing the distribution of assets already in the Court's escrow fund), long after the orders of dismissal had been entered. No. 78–1140, Dk. no. 39.]

January 9, 1986: Kalodner and Kohn filed separate motions and memoranda in support for reconsideration or, in the alternative, for Rule 54(b) certification, of the denials of their motions to vacate in *Waite, Johnson,* and *Union Oil.* No. 78–1357, Dk. nos. 48, 49; No. 78–1140, Dk. nos. 41, 42; No. 79–1318, Dk. nos. 26, 27. [On February 20, 1986, the Court denied these motions for reconsideration or Rule 54(b) certification. No. 78–1140, Dk. no. 54.]

January 24, 1986: Kalodner and Kohn requested permission and filed a memorandum in support of their request for permission to file a brief *amicus curiae* in support of DOE's motion to vacate the order of dismissal in *Johnson.* Dk. nos. 46, 47.

April 28, 1986: Kalodner and Kohn requested permission to file a reply in support of the DOE's motion to vacate the order of dismissal in *Cities Service.* Dk. no. 54.

### 3. Participation in Multidistrict Litigation Cont.

April 16, 1985: Kalodner and Kohn filed a response to the Petroleum Marketers Association's motion to expedite the issuance of the OHA Report. Dk. no. 627.

July 26, 1985: Kalodner filed an amended motion for class certification and a supplemental memorandum in support of that motion. Dk. nos. 641, 642. [On December 30, 1985, the Court denied the motions for class certification. Dk. no. 716.]

October 7, 1985: Kalodner filed a motion to require the OHA to supply the Court with its recommendations as to necessary further proceedings and as to a restitutionary mechanism. Dk. no. 682.

November 6, 1985: Kalodner filed a motion for discovery as to whether the April 1, 1985 OHA Report was its final report. Dk. no. 701.

January 9, 1986: Kalodner filed a motion for reconsideration of the denial of class certification and a memorandum in support of that motion. Dk. nos. 718, 719.

January 22, 1986: Kalodner filed a reply in support of his motion to require the OHA to supply the Court with its recommendations. Dk. no. 726.

February 7, 1986: Kalodner filed a reply in support of his motion for reconsideration of the denial of class certification. Dk. no. 736. [On February 4, 1987, the Court had denied the motion for reconsideration of its denial of class certification. Dk. no. 735.]

February 11, 1986: Kalodner filed a motion for extension of time in which to respond to the motion of the Georgia Poverty Rights Organization ("GPRO") to intervene and a response to the motion to intervene. Dk. nos. 739, 740.

March 24, 1986: Kalodner filed a reply to GPRO's motion for reconsideration of the order denying it intervention. Dk. no. 753.

April 9, 1986: Kalodner and Kohn filed a reply to Total's memorandum in support of a settlement conference and comments on the report of the OHA. Dk. no. 766.

June 2, 1986: Kalodner, along with the majority of the other parties to the settlement, signed a joint memorandum in support of the settlement agreement. Dk. no. 814.

### C. *Evaluation of Reasonable Hours*

[2] The Court has carefully reviewed Kalodner's fee petition and the history of his participation in this multidistrict litigation and other related cases. While Kalodner should be commended for certain of his efforts in these cases—he afforded his clients the most zealous of representation and played a significant role in the efforts to redistribute the overcharges to end users—the Court is troubled by a number of opposing considerations.

In *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–1940, the United States Supreme Court emphasized the need for counsel to exercise billing judgment:

> Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fees submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall*, 205 U.S. App. D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

The teaching of *Hensley* is that counsel must bill only for necessary time and must reduce excessive hours in his billing. *See also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563–64, 106 S.Ct. 3088, 3097, 92 L.Ed. 2d 439 (1986); *Mares v. Credit Bureau of Raton*, 801 F.2d 1197 (10th Cir.1986).

Contrary to these instructions, Kalodner billed every hour logged—and, indeed, billed for over 750 (or 1500, according to his most recent calculation) hours of *unrecorded* time—in what seemed to be an attempt to reach the maximum fee he negotiated. No adjustments were made for any reason. More importantly, the Court has serious reservations about the necessity of the plethora of motions filed by Kalodner. While Kalodner and Kohn did save time and expense for their clients by filing a number of consolidated memoranda, the history of the litigation is replete with examples of unnecessary lawyering.

Kalodner fought issues of limited significance to his clients (e.g., the July 5, 1983 opposition to plaintiff's motion for relief from escrow accounting fees, the February 11, 1986 response to the motion of the Georgia Poverty Rights Organization to intervene, and the March 24, 1986, reply to GPRO's motion for reconsideration of the order denying it intervention). Kalodner filed multiple memoranda on a single issue, and the supplementary pleadings were little more than repetitious of the initial arguments. For example, the July 6, 1983 memorandum of points and authorities in support of the motion for class certification was filed in tandem with a summary memorandum in support of the motion for class certification. On July 26, 1985, Kalodner filed an amended motion for class certification and a supplemental memorandum in support of that motion. Particularly troubling were the *separate* motions to vacate in the tagalong cases (on January 28, 1985, April 15, 1985, April 16, 1985, and July 9, 1985), each of which was accompanied by a memorandum in support. These motions came complete with individual reply briefs (on April 24, 1985, June 3, 1985, June 3, 1985, and September 16, 1985), a supplemental memorandum (February 13, 1985), a notice of relevant filings (May 28, 1985), *and* a notice of *additional* relevant filings (July 26, 1985). In almost all of these filings, Kalodner spent the majority of his time attempting to justify his clients' standing even to make the motions to vacate the dismissals. The Court ultimately ruled that the movants lacked standing.

Moreover, Kalodner continued to fight issues long after their deaths. Upon losing the class certification issue, he filed a motion for reconsideration of the matter (January 9, 1986). When the Court determined that the movants lacked standing to make the motions to vacate the dismissals in the tagalong cases, Kalodner filed separate motions and memoranda in each of the cases for reconsideration or, in the alternative, for Rule 54(b) certification of the issues (January 9, 1986). He even resurrected the issue in his opposition to GPRO's motion for intervention (February 11, 1986).

In addition, Kalodner became involved in every battle, even ones which were being fought effectively by the principal parties affected. On April 1, 1983, Kalodner joined the ranks of six previous parties who opposed the referral of the remedy issue to the OHA. Then on April 5, 1983, Kalodner opposed the motion of the intervening refiners for an extension of time in which to object to the referral of the remedy issue. The refiners were on the same side of the issue as Kalodner's clients. On December 20, 1983, Kalodner (along with four other parties) opposed certification of the constitutional issues to TECA.

Kalodner spent a significant amount of time constructing unnecessary paperwork. On April 1, 1983, Kalodner addressed in a lengthy memorandum the substance of Total's motion for distribution of escrowed funds, while the DOE filed a brief procedural objection. After the Court denied the motions to vacate the dismissals in the tagalong cases, on January 24, 1986, Kalodner requested permission and filed a memorandum in support of his request for permission to file a brief *amicus curiae* in support of the DOE's motion to vacate the order of dismissal in *Johnson*. On April 28, 1986, Kalodner requested permission to file a reply in support of the DOE's motion to vacate the order of dismissal in *Cities*.

Finally, at least in the multidistrict litigation, Kalodner did not pick his battles well. He became involved in every dogfight. Often, the time Kalodner expended on pleadings was disproportionate to the weight of the issues. His time records (particularly when viewed in light of the Court's chronology of his participation in the litigation) do not exhibit the same economy of effort as that reflected in Bassman, Mitchell and Alfano's records. In sum, Kalodner expended a disproportionate amount of time on issues of limited impact to his clients, deluged the Court with a profusion of paperwork, and failed to strategically limit his efforts.

### D. *Disallowance of Certain Fees*

#### 1. Class Action Motions and Memoranda in the M.D.L.

■ In addition to examining the necessity of the work performed for purposes of an attorney fees award, a court must also evaluate the results obtained in the litigation. *See Jackson v. Color Tile, Inc.,* 638 F.Supp. 62 (N.D.Miss.1986). If a party does not prevail on all of his claims for relief, the court must determine whether a downward adjustment of the lodestar figure is necessary. While a fee award should not be reduced simply because a litigant failed to prevail on his major theory of litigation, the merit of the arguments made and the results obtained may justify a reduction in the fee award. *Exhibitors' Service, Inc. v. American Multi–Cinema, Inc.,* 583 F.Supp. 1186 (C.D.Cal.1984). The Supreme Court stated in *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940, that "[t]here is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment."

■ While the docket sheet reflects that Kalodner was on the losing end of almost every motion he filed, the Court recognizes that the merit of a lost battle may be in the fight rather than the outcome. However, Kalodner failed entirely on his major theory of participation: his class action strategy. Kalodner requested the certification of a class of over 150 million motor vehicle users of oil products. The Court held that "no requirement of

Rule 23(b) can be satisfied with respect to any of the proposed classes." Dk. no. 716, p. 5. Further, the Court found that

individual questions of fact predominate because the proof of actual impact would vary substantially among the class members. Indeed, the paramount question in the class action context would be precisely the question the litigants are now struggling with in the multidistrict litigation context: whether the impact of the overcharges is traceable.

*Id.* at pp. 7–8. Finally, the Court determined that a class consisting of 150 million people would be "distinctly unmanageable." In short, the class action strategy pursued by Kalodner made very little sense.

In evaluating whether an award of fees for time expended on this unsuccessful strategy is appropriate, the Court has tried to ascertain whether this unsuccessful strategy was related to the claims upon which Kalodner succeeded. *See City of Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 2691, 91 L.Ed.2d 466 (1986). The Court believes that Kalodner would have achieved the same measure of success with respect to the settlement agreement without pursuing this almost frivolous class action strategy. In addition, the Court notes that even when Kalodner speaks in terms of his "successes," he often talks about being granted leave to participate rather than of results to his clients. Because Kalodner uselessly expended time filing motions relevant to this theory, the Court shall disallow all hours claimed by Kalodner for work on the various class certification motions and memoranda in this multidistrict litigation. (While Kalodner apparently also filed a request for class certification in what he has labeled section 155 litigation, the Court is not in a position to disallow fees for that strategy in the context of other litigation.)

### 2. Fees in *Exxon*

■ Kalodner has requested fees for his participation in *United States v. Exxon.* The Court received a letter from Marshall Staunton, Administrator of the Economic Regulatory Administration of the Department of Energy, in support of Kalodner's fee petition. Staunton noted that his fee recommendation did not include the recommendation of fees for Kalodner's participation in the *Exxon* litigation. In *United States v. Exxon,* No. 78–1035, at 5 (D.D.C. June 10, 1986) [available on WESTLAW, 1986 WL 15771], Judge Thomas Flannery held that "[i]n no event shall any of the *Exxon* monies be used for attorneys fees."

Judge Flannery wanted the monies recovered by the attorneys in that case to go to the attorneys' clients. This Court finds Judge Flannery's intentions commendable. As a matter of comity, this Court will not permit the recovery in the context of the instant litigation for fees earned in the *Exxon* litigation, when the judge presiding over *Exxon* disallowed such fees. Therefore, the Court shall disallow fees for all hours claimed by Kalodner for work on the *Exxon* litigation.

### 3. Unrecorded But Billed Time

■ In *Hensley* the Supreme Court emphasized the importance of accurate recordkeeping. In that case the Court expressly affirmed the district court's one-third reduction of one attorney's hours, "to account for his inexperience and failure to keep contemporaneous time records." 461 U.S. at 438 n. 13, 103 S.Ct. at 1942 n. 13. *See also Ramos v. Lamm,* 713 F.2d 546, 553 (10th Cir.1983) (attorneys "must keep meticulous, contemporaneous time records to present to the court upon request"); *Dickerson v. City Bank & Trust Co.,* 590 F.Supp. 714, 717 (D.Kan.1984) (attorneys must submit adequate time records in support of fee petitions). Kalodner has submitted a fee request which includes fees for approximately 750 hours of completely unrecorded time, or about one-sixth of his total time billed. No documentation was offered in support of such hours charged. Despite several telephone calls from the Court, Kalodner has insufficiently documented his claim. Indeed, apparently this time was never recorded, and the figure is simply Kalodner's best guess as to the extra time he spent on the case. No attorney would send such a bill to a client. Thus, the Court shall disallow attorney

fees for the 750 hours of unrecorded but billed time.

In his most recent attorney fees filing, the Supplemental Declaration, Kalodner has reevaluated the amount of unrecorded time and has doubled the 750 hour figure to 1500 hours:

> The Bassman, Mitchell and Alfano application, and the supporting time records, permitted me to check the accuracy of my estimate as to unrecorded time, by reviewing my time expended against the time expended by that firm in an important aspect of the case in which I played a somewhat larger role than did they. I examined our respective recorded time in connection with the OHA proceedings held on referral by this Court, including the filing of Comments, the review of filings by others, preparation for the hearings, the hearings, briefing and oral argument before the OHA. The BMA records reflected a total of 1325 hours, while my recorded time was 655 hours. In both cases, the recorded time expended on this aspect of the case was approximately 20% of the time for which we respectively sought compensation. Since I am confident my efforts exceeded theirs, as the record of those proceedings demonstrate, and since I have no reason to question the accuracy of their records or that they operated efficiently, I conclude that my time expended on this aspect of the case must be understated by several hundred hours. If the understatement of my time is only 300 hours on this aspect of the case, less than half the difference in our hours, and if such is typical of the entire case, and I have no reason to believe otherwise, my time is actually understated by 1500 hours (300 multiplied by 5, to reflect the fact that the examined phase represented slightly less than 20% of my recorded time).

Dk. no. 1056, pp. 2–3.

The Court has serious reservations about both Kalodner's logic and his arithmetic. The salient difference between the instant fee request and the request made by Bassman, Mitchell and Alfano is that the latter recorded every hour claimed. Kalodner's recent estimate of 1500 unrecorded but billable hours, upped from the initial estimate of 750 hours, and apparently submitted so that his fee would be no less than $850,000.00, seems to be a recalculation to arrive at a predesignated amount. In *United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Association, Local 307 v. G & M Roofing and Sheet Metal Co., Inc.,* 732 F.2d 495, 502 (6th Cir.1984), the Sixth Circuit held, "Where the documentation is inadequate, or recently compiled retrospective estimations of time expended, the district court would do violence to its judicial obligations were it to accept the amounts claimed at their value." The Court shall disallow fees for the extra 750 unrecorded hours.

### E. *Hourly Rate*

■ Reasonable fees are to be calculated according to the prevailing market rates in the relevant community. *Blum,* 465 U.S. at 894, 104 S.Ct. at 1546. The burden is on the fee applicant to demonstrate that the requested rate is in line with those in the community for similar services by lawyers of reasonably comparable experience and reputation. *Id.* at 895–96 n. 11, 104 S.Ct. at 1547 n. 11. Kalodner has stated in his cover letter that, while he was prepared to do so if the Court had any questions, he was not submitting any material with regard to comparable rates, since he had not been asked to do so. In *Blum* the Supreme Court held that the burden was on the fee applicant to demonstrate the reasonableness of his requested rate; the *Blum* Court did not hold that the burden was on the court to request documentation. Further, since the Court had already made several telephone calls requesting other documentation by the time it came to the rate issue, the Court was not inclined to request further information.

The Tenth Circuit has held in *Ramos,* 713 F.2d at 555, that "[absent unusual circumstances], the fee rates of the local area should be applied even when the lawyers seeking fees are from another area." The current hourly rate for fees awarded in Kansas ranges from $60 to $100 per hour. *See, e.g., Service v. Board of Public Utili-*

ties, No. 83–2206 (D.Kan., *unpublished,* November 13, 1986) [available on WEST-LAW, 1986 WL 15658]. These rates are too low for the present type of litigation. Since the instant litigation is multidistrict in nature, this Court believes that the relevant community for hourly rate purposes is the group of attorneys who specialize in oil and gas law in complex, multidistrict litigation. Since all of the fee applicants belong to that group, the Court is able to ascertain a standard, reasonable hourly rate for these practitioners.

Kalodner initially requested a rate of $175 per hour, which was his standard hourly rate. On February 20, 1987, Kalodner informed the Court that his hourly rate has been increased to $180 per hour which, he contends, would justify an increase in his lodestar. The Court awarded Bassman, Mitchell and Alfano a rate of $175 per hour. The Court found that $175 per hour was justified in comparison to hourly rates charged by other attorneys in the energy field. Dk. no. 988, p. 11. The Court wants to treat all attorneys in this litigation in a substantially similar manner. The hourly rate of $175 is justified by Kalodner's level of skill and experience, since he has thirty years of litigation experience, he served for three and one-half years as Chief Enforcement Counsel of the Department of Energy for the Northeastern United States, and he has a significant amount of experience in energy litigation. Therefore, the Court shall award Kalodner fees on the basis of a rate of $175 per hour.

### F. Enhancement of Fee Award

■ The Court notes that no enhancement of the lodestar amount is warranted in this case by the results obtained, the contingent nature of the fee, or the complexity of the legal issues involved. The Court discussed the results above. Since Kalodner specializes in energy litigation, he is not entitled to an enhanced fee on the basis of complexity. *See Abolahrari v. Electro Dynamics Corp.,* No. 83–2289 (D.Kan., *unpublished,* August 27, 1985) [available on WESTLAW, 1985 WL 9681]. Finally, the Court finds that the contingent nature of the fee in this case is subsumed

within the initial lodestar calculation. *Hensley,* 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9. Therefore, the Court shall deny Kalodner's request for a multiplier of 1.3.

### III. EXPENSES

Kalodner has submitted a request for $111,259.70 in expenses as a part of his total request for $850,000.00. Kalodner's initial delineation of expenses comprised only a single page, which listed ten categories (expert witness fees, duplicating and printing, travel, special postage, transcripts, long distance telephone, staff overtime, court costs and filing fees, Lexis computer research and miscellaneous), with total amounts spent in each category. Dk. no. 895, Exh. B. The category totals were added for an overall expense amount of $166,059.28. Kalodner has requested ²⁄₁₃ of the overall total, or $111,259.70, and Kohn has requested the remaining ⅓, or $54,-799.56.

By telephone, the Court requested more specification in the major categories of expenses (witness fees and travel). On March 9, 1987, Kalodner filed supplemental data in support of his motion for fees and expenses, which contained supporting material for expenses in the areas of witness fees, travel, and rates of associate counsel. The Court finds these specifications sufficient for an award of expenses. However, for the reasons explained above, the Court shall not allow any expenses in connection with the *Exxon* litigation or for the class certification motions filed in this multidistrict litigation.

### IV. CONCLUSION

The Court has been troubled by some aspects of the instant fee petition. A review of the chronology of Kalodner's participation in this litigation left the Court with the unmistakable impression that Kalodner's work in this lawsuit was prompted to an unwarranted degree by a desire for fees. While the instant situation is not entirely akin to that in *Mares,* 801 F.2d at 1207, where the "attorney's only cognizable contribution to the litigation is his search for fees," many of the projects Kalodner

undertook did not appreciably benefit his clients.

Furthermore, the saga of pleadings by Kalodner and phone calls from the Court requesting more specification with regard to his fee petition has been disturbing. Kalodner appeared to believe that because he negotiated his fee with the other parties, he did not have to document or justify the work he performed in order to obtain Court approval. Indeed, while other parties spent time documenting the work they performed, Kalodner concentrated on informing the Court on how he bartered for his fee. *See* History of Development of Fee Provision for Philip P. Kalodner and Kohn, Savett, Klein and Graf, Dk. no. 991. Finally, the original billing, with its 750 hours of unrecorded but billable time, appeared to be an afterthought to arrive at the negotiated amount of $850,000.00. The Supplemental Declaration, filed six months after the initial fee request, appeared to be a reconstruction to arrive at the negotiated amount.

The Court has a significant amount of respect for Kalodner and for his work in general. Yet the Court is duty bound to insure that an attorney not receive more legal fees than his work warrants at the expense of the attorney's clients. (In this respect, the Court was somewhat perplexed at the statement in Kalodner's Supplemental Memorandum that if the Court disallowed the requested fees and expenses, the moneys would not be returned to the States and the DOE, but would instead "redound to the benefit of Surface Transporters, thus allocating to claimants funds intended to be expended for legal fees and expenses." Dk. no. 1009, p. 5.) One of the methods for insuring that an attorney not benefit by way of fees at his client's or adversary's expense is to evaluate his litigation strategies and successes. For the reasons detailed above, the Court was compelled to disallow fees for Kalodner's unrecorded time, his work in the *Exxon* case, and his class action strategy.

IT IS THEREFORE ORDERED that Kalodner's request for fees for the 750 or 1500 hours of unrecorded time, for his work on all motions and memoranda regarding the class action request in this multidistrict litigation, and for the time spent in connection with the *Exxon* litigation is hereby denied.

IT IS FURTHER ORDERED that Kalodner's fee petition is granted in all other respects. However, before the Court shall order the disbursement of fees to Kalodner, Kalodner must submit to the Court a calculation of reimbursable time. This calculation may be phrased in terms of lump sums: the amount of fees authorized minus a lump sum for the 750 hours, minus a sum for the time spent on the class action work, minus a sum for the *precise* amount of time spent on *Exxon*, multiplied by the hourly rate of $175 per hour.

IT IS FURTHER ORDERED that Kalodner's request for expenses is granted, with the exception of fees for work on *Exxon* and on the class action pleadings. Before the Court shall order disbursement of funds for expenses, Kalodner must submit a recalculation of expenses according to these limitations. Kalodner is ordered to submit the above calculations concerning fees and expenses to the Court within fifteen (15) days from the date of this Order.