In re **NESHAMINY OFFICE BUILDING ASSOCIATES, Debtor.**

**Bankruptcy No. 81–00391G.**

United States Bankruptcy Court, E.D. Pennsylvania.

July 21, 1987.

---

Nathan Lavine, Gary D. Bressler, Adelman Lavine Krasny Gold & Levin, Philadelphia, Pa., for debtor, Neshaminy Office Building Associates.

Alexander N. Rubin, Jr., Rubin, Quinn and Moss, Philadelphia, for the trustee, Norman M. Kransdorf.

Leonard M. Klehr, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, Pa., for Limited Partners of NOBA.

## MEMORANDUM OPINION

BRUCE FOX, Bankruptcy Judge:

The issue before me in this longstanding controversy is whether I should approve a settlement between the trustee of a chapter 11 debtor, Fidelity America Mortgage Co. ("FAMCO"), and Neshaminy Plaza Associates ("NPA"). Several limited partners of Neshaminy Office Building Associates ("NOBA"), a limited partnership organized by FAMCO, object to the settlement. For the reasons set forth below, I will deny the trustee's application for approval of the settlement.

### I.

The dispute arises from a 1979 installment sales agreement between FAMCO and NPA in which NPA sold FAMCO two office buildings and the underlying land located in Bucks County, PA and known as Neshaminy Plaza. On the same day, FAMCO sold the buildings and leased the land to NOBA. Under the terms of the NPA–FAMCO installment sales contract, the purchase price for the buildings and land was $1,850,000.00, plus FAMCO's assumption of NPA liabilities in the amount of $200,000.00, and an additional $70,000.00 in real estate commission fees.

Of particular relevance in the instant controversy is paragraph 25(a) of the NPA–FAMCO installment sales agreement. Paragraph 25(a) provides the following remedies, *inter alia*, upon the occurrence of a default:

(i) Seller may declare the entire unpaid portion of the purchase price and any other sums which Buyer may be obligated to pay to Seller by any provision of this Agreement immediately due and payable. Upon the payment of such sum by Buyer to Seller, settlement for the Premises shall take place pursuant to Section 5 hereof.

(ii) Seller may terminate this Agreement and resell the Premises for such consideration and upon such terms as Seller may deem best consistent with the then value of the property and the then existing conditions; and Seller will apply the monies collected under such resale first to the payment of the reasonable expenses, including sales brokerage commissions in connection with such resale and attorneys' fees to which Seller may have been put to obtain possession from Buyer; second, to the costs of restoring the property to a saleable condition; and, third, the balance of the net amount of the resale consideration on account of the unpaid balance of all sums payable by Buyer to Seller under this Agreement; and Buyer shall remain liable for any deficiency after the application of the said net proceeds. If such net proceeds are in excess of the balance of such sums, then such excess shall be paid to Buyer.

\* \* \* \* \* \*

(iv) After ten (10) days' written notice, Seller may take possession of the Premises, by the summary procedure set forth in sub-section (iii) above or otherwise, without terminating this Agreement, and Seller may collect rentals and enforce all other remedies of Buyer under any existing leases for any part of the Premises, but without being deemed to have affirmed such leases, and Seller may enter into new leases on such terms as Seller may deem fit for any portion or portions of the Premises, and such cases shall not be terminated or affected if Buyer cures the Event of Default. Rentals under said Leases may be applied by Seller to any repair or maintenance of the Premises as Seller may reasonably deem useful,

and the remaining balance shall be applied to Buyer's obligations hereunder in order of priority to be determined by Seller. Any balance of rentals remaining thereafter shall be promptly paid over to Buyer.

Subsequently, FAMCO failed to make the installment payments required by the contract, even though it had received $1,250,000.00 in cash and notes from NOBA pursuant to the FAMCO–NOBA lease and sale agreement. The funds received from NOBA were not used by FAMCO to meet its obligations to NPA. As a result of FAMCO's default, NPA took possession of the subject property and instituted an action in ejectment which resulted in a judgment in its favor. NPA also confessed judgment for the amounts due from FAMCO under the installment sales contract. NPA has since remained in possession of the property.

In February 1981, FAMCO filed a chapter 11 petition for itself and NOBA. Subsequently, FAMCO filed, on behalf of itself and NOBA, an application for clarification of the automatic stay (hereinafter "clarifying application"). In the clarifying application, FAMCO asserted that the Neshaminy property was property of the FAMCO and/or NOBA estates and requested an order prohibiting NPA from transferring or encumbering the property. A hearing on the application was held on May 5 and 21, 1981. No decision on the application was rendered by the time the trustee (Norman M. Kranzdorf) was appointed for FAMCO and a moratorium imposed with respect to all FAMCO litigation.

After his appointment, the trustee attempted to open or strike the state court ejectment action. This effort was unsuccessful. Thereafter, the trustee negotiated a settlement with NPA. The agreement was put in the form of a stipulation dated November 21, 1982, which was executed by counsel to the trustee and counsel for NPA. The stipulation provides, in pertinent part

that the [clarifying application] be dismissed with prejudice and the controversy stemming therefrom be settled, and ended upon the payment to FAMCO by NPA of the sum of five thousand dollars ($5,000.00).

This Stipulation shall be submitted to the court for approval of the settlement of the controversy.

The trustee filed an application for approval of the stipulation and settlement. The application states that the stipulation provides for the dismissal of the clarifying application "and the settlement of the controversy stemming therefrom upon the payment of the sum of $5,000.00 to FAMCO." Notice of the application was given to the counsel to the creditors' committee, debtor's counsel and counsel to NOBA's limited partners.[1] The notice states, *inter alia,* that the settlement is in "full settlement and FAMCO's claims to certain property will be extinguished." Several limited partners of NOBA (hereinafter "the NOBA limited partners") filed objections to the application for approval of the settlement.

A hearing on the application for approval of the settlement was held on July 30, 1984. On September 28, 1984, (then) Chief Judge Goldhaber issued an order approving the settlement. *In re Fidelity America Financial Corp.,* 43 B.R. 74 (Bankr.E.D.Pa. 1984) (*"In re FAFC"*). The NOBA limited partners then took an appeal from that order to the district court. On June 24, 1986, the district court reversed the bankruptcy court order and remanded the case for further proceedings. *In re Neshaminy Office Building Associates,* 62 B.R. 798 (E.D.Pa.1986) (*In re NOBA*).

After remand, the bankruptcy court held an evidentiary hearing on September 12, 1986, in conformity with the district court's mandate. The case was reassigned to the undersigned shortly before Chief Judge Goldhaber's retirement on December 31, 1986. Oral argument was held on February 11, 1987. All counsel assented to my

---

1. The notice is dated May 11, 1984. No explanation has been given for the substantial delay in

bringing the settlement before the court.

disposition of this matter without the need to reopen the record.

## II.

There is no dispute with respect to the standards I must employ in deciding whether to approve the proposed settlement. These standards were fully set forth in the district court opinion in this case.

Approval of the settlement lies within the sound discretion of the Bankruptcy Court. *Fogg v. Sherman Homes, Inc.* (In re Sherman Homes, Inc.), 28 B.R. 176 (Bankr.D.Me.1983); *Providers Benefit Life Insurance Co. v. Tidewater Group, Inc.* (In re Tidewater Group, Inc.), 13 B.R. 764 (Bankr.N.D.Ga.1981). In deciding whether to approve a settlement, the court must determine whether the proposed settlement is in the best interest of the estate. *Fogg, supra; Tidewater Group, supra. See, In re Hallet,* 33 B.R. 564, 566 (Bankr.D.Me.1983) (trustee has burden of showing that the compromise is in the best interest of the estate).

In exercising its discretion regarding whether to approve a trustee's application to settle a controversy, relevant criteria which the Bankruptcy Court may consider include: (1) the probability of success in the litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interests of the creditors. *In re Patel,* 43 B.R. 500, 504–05 (N.D.Ill.1984); *In re Carla Leather,* 44 B.R. 457, 466 (Bankr. S.D.N.Y.1984); *Tidewater Group, supra,* 13 B.R. at 765, *W.T. Grant,* 4 B.R. 53, 69 (Bankr.S.D.N.Y.1984). In determining whether to approve the trustee's application to settle a controversy, the Bankruptcy Court does not substitute its judgment for that of the trustee. *Carla Leather, supra,* 44 B.R. at 465. "Nor is the court 'to decide the numerous questions of law and fact raised by [objections] but rather to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness.'" *Id. quoting, In re W.T.* *Grant Co.,* 699 F.2d 599, 608 (2d Cir. 1983).

*In re NOBA,* 62 B.R. at 803; *accord, In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 390, 395–96 (Bankr.E.D.Pa.1987); *In re FAFC,* 43 B.R. at 76.

My application of the foregoing standards to the facts of this case will be facilitated by first reviewing the district court decision previously issued as well as the parties' contentions on remand.

In its opinion, the district court acknowledged the facts which led the bankruptcy court to approve the settlement: (1) that the property had a prepetition delinquency in excess of $500,000.00 and did not have a positive cash flow; and (2) that an ejectment judgment had been entered in state court, rendering less likely the clarifying application's chances of success. The district court nevertheless concluded that the record was insufficient to permit the bankruptcy court to find that the settlement was in the best interest of the NOBA estate. 62 B.R. at 803–04. The district court instructed the bankruptcy court, on remand, to "develop an understanding of the value of the rights being relinquished by NOBA, and the value of what NOBA receives in return." *Id.* at 804.

In making the determination in accordance with the district court's mandate, I must keep in mind that the existence of a substantial prepetition delinquency and the negative cash flow does not, by itself, establish that NOBA's interests in the property are worthless, as those may be desirable conditions for a limited partnership. Moreover, I must consider the effect of paragraph 25(a) of the NPA–FAMCO installment sales agreement. To the extent paragraph 25(a) may be valuable to FAMCO, it may similarly have value to NOBA to the extent of NOBA's equity in its contract with FAMCO. *Id.* Finally, the district court pointed out that the settlement does not apportion the $5,000.00 payment as between the FAMCO and NOBA estates. *Id.*

In its memorandum of law in opposition to the trustee's motion for approval of the settlement, the NOBA limited partners

have advanced several related arguments. First, they contend that the settlement agreement is ambiguous and, because the terms of the agreement have not been clarified by the remand hearing, the bankruptcy court cannot intelligently evaluate the merits of the settlement. They focus on the question whether the trustee has surrendered in the settlement the rights FAMCO and/or NOBA may have under paragraph 25(a) of the NPA–FAMCO installment sales agreement, which, in their view, are worth far in excess of the $5,000.00 NPA has agreed to pay.[2] Second, the NOBA limited partners argue that, even if the settlement did not relinquish the paragraph 25(a) rights, the trustee has presented no additional factual material in support of the settlement beyond the evidence which the district court has already found insufficient. Next, they argue that rights of FAMCO and/or NOBA under the installment sales agreement were not terminated prepetition; as a result, they assert the property is subject to the automatic stay and the trustee's clarifying application would be likely to succeed on the merits. Finally, the NOBA limited partners emphasize that the trustee has not set forth, in either the settlement agreement itself or during the remand hearing, how the settlement proceeds will be apportioned as between the FAMCO and NOBA estates.[3]

On remand, the chief proponent of the settlement has been NPA.' In response to the NOBA limited partners, NPA argues in its memoranda of law that the terms of the settlement agreement are clear and that the trustee has not, by reason of the settlement, given up any of FAMCO's rights under paragraph 25(a) of the installment sales agreement. NPA asserts that FAMCO's interest in the property was terminated prepetition and FAMCO and NOBA could not ultimately succeed on the merits of the clarifying application in light of the decision in *In re Fidelity American Mortgage Co.*, 19 B.R. 568 (Bankr.E.D.Pa.1982). (*"Whispering Brook"*). Therefore, according to NPA, the settlement must be in the best interest of the debtors because the trustee will receive $5,000.00 in return for discontinuing hopeless litigation.[4] NPA further asserts that additional evidence was presented on remand to establish that the settlement is in the best interest of NOBA.[5] Finally, NPA states its assumption that the apportionment of the $5,000.00 in settlement proceeds would be resolved by the bankruptcy court after the approval of the settlement.

### III.

Pursuant to the instructions of the district court, this court's function on remand

2. The NOBA limited partners base their sanguine view of the value of the property on evidence which suggested that: (1) as of the end of 1982, the property had positive, albeit small, cash flow and (2) during the relevant time period, the property may have had a value in excess of FAMCO's obligation to NPA.

The NOBA limited partners never squarely confront the question whether NOBA has any direct rights under the NPA–FAMCO installment sales agreement or whether NOBA had any equity, as described by the district court, under the FAMCO–NOBA agreement. Instead, the NOBA limited partners point out that NOBA is a creditor holding a substantial claim in the FAMCO bankruptcy and therefore, would be harmed by permitting FAMCO to waive its rights under the NPA–FAMCO installment sales agreement for less than fair consideration.

3. This is not intended to be a complete summary of every argument made by the NOBA limited partners in their forty-one page memorandum of law.

4. As I understand NPA's theory, it matters little whether there was a positive cash flow and

equity in the property (as the NOBA limited partners suggest) or, conversely, whether the property was losing money (which could be beneficial to NOBA as the district court suggested). Regardless of the manner in which retention of the property may have benefited NOBA, NPA's position is that the debtors had lost all interest in the property prepetition and, in light of *Whispering Brook*, the recovery of $5,000.00 in settlement exceeded any amount that could be recovered by litigating to retain the subject property in the estate.

5. This includes evidence which, NPA contends, establishes that neither FAMCO nor NOBA had any equity in the premises. Thus, in NPA's view, even if FAMCO and NOBA retained some interest in the property (other than under paragraph 25(a)), the payment of $5,000.00 exceeded the value of their interest in property. This could be further evidence that the settlement was in the estates' best interest—particularly since the debtors' claimed interest in the property was itself disputed.

is to evaluate the value of the rights being relinquished by NOBA in the settlement and the consideration to be provided to FAMCO for surrendering those rights. It is elementary that before I can place a value on the rights being given up in a settlement, it is first necessary to identify those rights. After years of litigation, it is somewhat surprising that there is a substantial dispute in this case regarding the terms of the NPA–FAMCO settlement. After reviewing the record, I am in agreement with the NOBA limited partners: the written stipulation memorializing the settlement is ambiguous on its face and its proponents failed to clarify its scope at the September 12, 1986 hearing. Specifically, it is not clear whether, under the agreement, the trustee is surrendering the debtors' rights under paragraph 25(a) of the installment sales agreement. The testimony at the hearing leads me to conclude that there has been no meeting of the minds on this critical question.

The three writings filed with the court in connection with the settlement and the application for court approval are all ambiguous on their face. Both the stipulation itself and the application seeking approval refer to the dismissal of the clarifying application *"and"* the settlement of "the controversy stemming therefrom." The use of the conjunctive can reasonably be read to at least imply that the settlement involved something other than the dismissal of the clarifying application. The notice of the application for court approval of the settlement sent to the parties in interest only compounds the ambiguity by stating that the proposed $5,000.00 payment is "in full settlement and FAMCO's claims to certain property will be extinguished." In the abstract, the extinguishment of "claims to property" can include a release of contract claims such as those set forth in paragraph 25(a).

NPA makes a plausible argument to the contrary, pointing out that the only issues raised by the clarifying application were the applicability of the automatic stay and whether NPA could transfer, assign, convey encúmber or otherwise dispose of the subject property. However, in reaching an agreement, it is certainly possible that the parties could have decided to address other related issues such as the future applicability of paragraph 25(a) of the installment sales agreement. Were the scope of the agreement as clear as NPA suggests, the parties would have easily clarified the terms of the settlement through the testimony presented to this court. However, the evidence presented and the representations of counsel to this court have been, at best, equivocal and, at worst, contradictory.

Three witnesses were questioned at the September 12, 1986 hearing regarding their understanding of the terms of the settlement agreement. The trustee answered questions on four occasions on cross-examination regarding whether, in his view, he would retain any interest in the subject property if the court approved the settlement agreement. His first response was:

I believe there is an open question as to whether ·or not we have a contingent interest in the excess sale proceeds under the original installment sales agreement.

September 12, 1986 notes of testimony (hereinafter "N.T.") at 57. After agreeing that by the term "contingent interest" he was referring to the potential right to receive sale proceeds pursuant to paragraph 25 if NPA sold the property in the future, *see* N.T. 59–60, the trustee then admitted that there was a question in his own mind whether the right to enforce the contingent interest exists. N.T. 62. Later, when asked what was the consideration in return for the $5,000.00 payment, the trustee stated enigmatically that the $5,000.00 was for FAMCO and NOBA "to give up their proceedings against NPA." N.T. at 66. Finally, on a fourth occasion, and only after a recess, the trustee stated that in his opinion he was not giving up the rights under paragraph 25(a). N.T. at 86–87.

NPA representatives were not any more consistent in their statements to the court on September 12, 1986. One of NPA's general partners testified as follows:

Q. What is your state of mind, your understanding personally as to whether the trustee, either as trustee of FAMCO continues to have if this agreement, this stipulation is stipulated to by the Court?

A. Well, frankly I don't know the answer now. I have heard a lot of different sides both back and forth and I'm not clear as to where I am right now on that.

N.T. at 120–21. Another NPA general partner did testify that he understood the stipulation "only to settle [the] issue which was outstanding which was the question of the automatic stay with regard to this property." N.T. at 178–79. However, counsel for NPA expressly declined to take any position on behalf of NPA on the question whether any rights under paragraph 25(a) would survive the settlement. N.T. at 75–77.

At oral argument, the parties focused their positions and it became clear that the conflicting testimony mirrored the parties' differing perceptions of the settlement. NPA believes that the settlement agreement itself waives no rights under paragraph 25(a) of the installment sales agreement;[6] at the same time, however, NPA believes that it effectively terminated all of FAMCO's rights in the property prepetition, including its rights under paragraph 25(a). The trustee, too, believes that he is giving up no rights under the agreement; however, he believes that the trustee retained substantial rights in the property at the time of the bankruptcy filing.[7] Indeed, at oral argument, the trustee posited that he not only has the right to excess sale proceeds under paragraph 25(a)(ii) in the event NPA sells the property, but he also has the right to compel a sale of the prop-

erty and the right to rental proceeds. The NOBA limited partners agree with the trustee that FAMCO retained substantial rights in the property at the time of the bankruptcy filing, but they are concerned that the trustee is surrendering those rights in the proposed settlement.

In the end, there are only two possibilities: either the trustee is surrendering all of his rights under the installment sales agreement (including those arising under paragraph 25(a)) or he is not. In neither event can I approve the settlement before me.

If the trustee is waiving his paragraph 25(a) rights, as the NOBA limited partners fear, the record is inadequate to support a finding that the trustee has met his burden of showing that the settlement is in the best interest of the estates. There is no evidence which would permit me to place a value on the trustee's rights under paragraph 25(a). No appraisal was offered into evidence. Moreover, the value of the right to "excess" sale proceeds under paragraph 25(a)(ii) may depend, at least in part, not on the market value of the property in 1982, but on the anticipated appreciation or depreciation of the property. It is not clear that the trustee ever took this consideration into account in 1982. Nor am I satisfied that, at the time he entered into the agreement, the trustee considered whether he could compel a sale of the property, which, as his counsel suggested at oral argument, may be possible.

If the settlement does not purport to waive any of the trustee's contractual

---

**6.** NPA's position may not be as unequivocal as stated in the text. At oral argument, NPA declined the invitation to add clarifying language to the agreement which would make clear that the trustee was not ceding, in the proposed settlement, any rights under the installment sales agreement. Apparently, NPA wishes to retain the possibility of arguing, in any later litigation to determine the extent of the trustee's rights in the property, that, by entering this agreement, the trustee waived any rights he may have still had at the time of the bankruptcy filing.

**7.** The trustee bases his position on one of two theories. First, he believes that the economic reality and the parties' true intent in the NPA–FAMCO transaction was to effect a sale of the property; the installment sale format for the

transaction was employed only because the existing mortgage on the property at the time of the agreement contained a due on sale provision. According to the trustee, this intent is most clearly evidenced by paragraph 25(a) itself which, much like a judicial sale in mortgage foreclosure, preserves for FAMCO any equity in the property if NPA sells the property after default. As in the deed/mortgage context, the trustee believes that his rights in the property are not extinguished unless and until NPA sells the property to a third party. Second, the trustee may be relying on language in paragraph 25(a)(iv) which states that NPA may exercise its rights under subparagraph (a)(iii) to eject FAMCO from the property upon default "without terminating" the agreement.

rights, a serious issue still exists between the NPA and FAMCO as to whether those rights exist. That the parties cannot agree on what the proposed settlement effectively means is reason enough not to approve it, for doing so would sanctify an agreement not understood, based upon a notice to the creditors that was either ambiguous or incorrect.

At bottom, the real issue between the parties is what rights, if any, the trustee retains under the installment sales agreement. NPA urges that by resolving that issue in its favor, (by holding, pursuant to *Whispering Brook,* that the debtors lost all interest in the property prepetition), I may find the settlement to be in the best interest of the debtors' estates. However, I believe that to conclusively determine the parties' rights under the installment sales agreement in the context of an application to approve the proposed settlement would be unfair to FAMCO and NOBA. The real thrust of the evidence at the hearings has related to whether or not an agreement was reached and the meaning of the agreement. The hearing was not focused on the issue whether the trustee, in fact and in law, lost his interest in the property prepetition.[8] For this reason, I conclude that this litigation is not an appropriate vehicle for resolving the fundamental dispute between the parties. The parties can certainly attempt to settle that dispute. If they cannot do so, either party can institute appropriate proceedings and a hearing will be held which will be directed to the *Whispering Brook* issue and the parties' respective rights under paragraph 25(a).

In sum, I am unable to approve a settlement where: (1) the parties cannot agree on its meaning and effect; (2) it is difficult to value the rights given up by the trustee due to the absence of an appraisal of the subject property as well as the agreement's ambiguity as to the nature of consideration given by the trustee; and (3) approval would require resolution of a major dispute between the parties which was not frontally addressed by them at the hearings held in the matter. In light of the foregoing and given the extremely small sum to be paid to the trustee compared to the potential value of his interest in the property and the size of the claims against the estate, I am satisfied that disapproval of this *de minimus* settlement is in the best interest of the estate.

I recognize that by declining to approve the settlement, I place NPA and FAMCO, after years of litigation, back to where they were in 1981. However, it is clear that, at some point in this case, the underlying dispute concerning what rights, if any, the trustee possesses under the contract, would have to be resolved anyway. In declining to approve the settlement, I am hopefully expediting the process for resolution of the dispute.

An order denying the trustee's application will be entered.

---

**8.** I am not overlooking the fact that a hearing was held on the clarifying application which touched upon the existence of rights possessed by the trustee postpetition. However, NOBA's limited partners did not participate in that hearing. If the parties wish the issues in the clarifying application to be resolved based on the evidence submitted at the hearing already held, at a minimum, it would be equitable to permit NOBA's limited partners an opportunity to supplement that record.